**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GONJA YAYLA, | : | |
| *Plaintiff*, | : | CIVIL ACTION NO. 5:20-CV-04395-EGS |
| | : | |
| v. | : | |
| | : | |
| VALLEY YOUTH HOUSE, | : | |
| t/a and/or d/b/a VALLEY YOUTH | : | |
| HOUSE COMMITTEE, INC., VALLEY | : | |
| YOUTH HOUSE ENDOWMENT | : | |
| FOUNDATION, and/or VALLEY | : | |
| YOUTH HOUSE, SPE, LLC[1] | : | |
| | : | |
| *Defendants*. | : | |

**JOINT MOTION AND INCORPORATED MEMORANDUM OF LAW
FOR APPROVAL OF THE PARTIES' FLSA SETTLEMENT**

Gonja Yayla ("**Plaintiff**") and Valley Youth House ("**Defendant**" or "**VYH**") (collectively the "**Parties**"), through their undersigned counsel, jointly move the Court for an Order approving the settlement reached in this action under the Fair Labor Standards Act ("**FLSA**"), 29 U.S.C. § 201 *et seq.* The Parties have negotiated a settlement to resolve this *bona fide* FLSA dispute after the exchange of substantial discovery and expert analyses to inform the damages calculations and the Parties' respective positions regarding liability and entitlement to damages, extensive arm's-length negotiations conducted by counsel well-versed in wage and hour litigation, and a mediation overseen by retired U.S. Magistrate Judge from the Eastern District of Pennsylvania, the Honorable Thomas J. Rueter (Ret.).

---

[1] Valley Youth House Committee and Valley Youth House SPE, LLC are incorrectly identified as "Valley Youth House Committee, Inc." and "Valley Youth House, SPE, LLC" in the caption. These two entities did not employ Yayla or any other potential class member. The entities have no assets and are improper parties to this case.

The Parties submit that the terms of their proposed Settlement Agreement and Release ("**Settlement Agreement**") are fair, reasonable, and adequate, particularly in light of the existence of disputed issues of fact with respect to liability and damages, uncertainty as to whether Plaintiff would obtain a judgment in their favor, along with the risks of trial and possible appeals.  *See generally* Exhibit 1, Settlement Agreement.

## I.    RELEVANT BACKGROUND

### a.  <u>Procedural History</u>

On September 8, 2020, Plaintiff instituted this action by filing an Individual, Collective and Class Action Complaint against Defendant in the United States District Court for the Eastern District of Pennsylvania.  [Doc. No. 1].  On November 19, 2020, Plaintiff filed her Second Amended Complaint against Defendant alleging violation of the FLSA.[2]  [Doc. No. 9].  Plaintiff alleged that she and other similarly situated Resident Advisors ("**RAs**") were not compensated for their uninterrupted overnight "sleep time" hours, as Defendant unlawfully excluded this time from the employees' "hours worked."  *See* Second Amended Complaint [Doc. No. 9].  On December 18, 2020, Defendant filed an Answer to Plaintiff's' Second Amended Complaint.  *See* Answer [Doc. No. 11].  Upon a series of scheduling conflicts among the Parties and the retention of expert economists and forensic accountants to calculate the totality of damages among the putative class, multiple amended conference orders were entered rescheduling a Settlement Conference before U.S. Magistrate Judge Marilyn Heffley.  [Doc. Nos.  17, 19-22, 26-27, 32].  Prior to a Settlement Conference being held, the Parties agreed that they would explore resolution of these claims through mediation.

---

[2] Plaintiff also alleged a violation of the Pennsylvania Minimum Wage Act of 1968, 43 P.S. §§ 333.101, *et seq*. ("**PMWA**").

On February 4, 2022, the Parties participated in a full-day virtual mediation before retired U.S. Magistrate Judge Thomas J. Rueter (Ret.). The negotiation was informed by Defendant's voluminous production of Plaintiff's time and payroll records from February 4, 2018 through September 16, 2020, separate wage and damage calculation analyses for each putative class member, and the Parties' thorough investigation of their claims, including arguments for and against Defendant's liability and Plaintiffs' entitlement to damages. The Parties reached an agreement in principle to settle claims on an individual basis for Plaintiff only. The Parties now seek the Court's approval of the Settlement Agreement.

### b. Nature of Plaintiff's Claims

Defendant is a non-profit organization that operates over 300 residential homes and facilities throughout Pennsylvania designed to support at-risk and disadvantaged youth. Since its inception more than forty years ago, VYH provides children and families with access to inclusive programming and resources to help facilitate independent living such as substance abuse and mental health counseling, academic support, mentoring, and transitional and emergency housing.

Plaintiff is a former VYH program participant who returned to work as Relief RA, and later as a full-time RA, in VYH's Transitional Living Program. Defendant's Transitional Living Program is designed to provide semi-supervised independent living for homeless and runaway youth. Plaintiff worked for Defendant as an RA for approximately fourteen years.

Plaintiff knew, understood and never complained when Defendant excluded "sleep time" from "hours worked." Plaintiff also knew that Defendant paid for any interruptions that occurred during sleep time. Plaintiff first raised an issue after Defendant changed its policies and prohibited all employees from bringing children to work. Defendant changed the policy in 2018 but made an exception for Plaintiff when she had her second child. Defendant permitted Plaintiff to bring

her two children to work.  Unfortunately, Defendant could no longer permit the exception once COVID hit in March of 2020, the same time that Plaintiff was expecting her third child.  Plaintiff took FMLA leave in late Spring, early summer of 2020.  She then used up her vacation and sick time and tendered her resignation in the Fall of 2020.

Initially, although Plaintiff maintained an outside permanent residence, Plaintiff worked and slept at VYH for five nights per week.  Beginning in 2018 due to Plaintiff's procurement of another job at an unrelated facility, Defendant accommodated Plaintiff's request to change her schedule to four days per week.  Generally, Plaintiff worked eight-hour shifts from Sunday through Thursday, from 4:00 p.m. to 12 a.m.  For approximately 5-6 hours, between 12:00 a.m. and approximately 6:00 a.m. ("**sleep time**"), Plaintiff slept at the facility and clocked-in and out briefly during the overnight hours to tend to any interruptions.  Plaintiff also clocked in and out the following morning to administer medication to the residents before leaving the facility.  VYH permitted Plaintiff and the other RAs to leave the facility until it was time to start their next shift at 4:00 p.m.  Plaintiff was compensated, with overtime wages if applicable, for each period that she clocked in and out.  Plaintiff alleged that Defendant violated the FLSA by not paying her for the uninterrupted portions of her sleep time, from approximately 12:00 a.m. to 6:00 p.m. each night when she did not clock in or out.

### c.  Legal Background

As a general rule, sleep time is compensable unless it falls within either of the two exceptions[3] set forth in 29 C.F.R. §785.22 or §785.23:

---

[3] The Pennsylvania Department of Labor and Industry has indicated that, for purposes of the PMWA, it has generally followed the federal regulations. *See Galloway v. George Junior Republic*, 2013 U.S. Dist. LEXIS 134014 at *28 (W.D. Pa. Sept. 19, 2013). Moreover, Pennsylvania courts have looked to the FLSA for guidance in applying the PMWA.  *See Galloway*, 2013 U.S. Dist. LEXIS 134014 at *28-29 (citing *Commonwealth of Pa. Dep't of Labor & Indus., Bureau of Labor Law Compliance v. Stuber*, 822 A.2d 870, 873 (Pa. Commw. 2003) (aff'd on appeal by 859 A.2d 1253 (Pa. 2004)).  Thus, the analysis for FLSA and PMWA claims are the same.  *See Galloway*, 2013 U.S. Dist. LEXIS 134014 at *29.

1.) Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. . . . Where no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked. (citations omitted).  29 C.F.R. §785.22(a).  If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted. For enforcement purposes, the Divisions have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time. 29 C.F.R. §785.22;

2.) **An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises**. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted.  29 C.F.R. §785.23.

29 C.F.R. §785.23 applies in this case.  Plaintiff never worked a 24-hour shift.   Plaintiff clocked out in the morning and was free to leave the premises and pursue her own endeavors until she clocked in again at 4:00 p.m.  *See also* Doc. No. 9, ¶¶ 26-28.  Outside of her scheduled shift, Plaintiff maintained freedom to leave the facility at her discretion, as she had time to work a second job for another employer which VYH accommodated.

The Parties dispute whether Plaintiff spent "extended periods of time" at the facility when she no longer used it as her permanent residence. The regulations do not define "extended periods of time"; however, the U.S. Department of Labor ("**DOL**") issued guidance to explain its interpretation of how "extended periods of time" are defined.  The DOL defines "extended periods of time," as someone who works and sleeps there for five days a week (120 hours or more) or five consecutive days or nights (regardless of the total number of hours).  *See* Exhibit 2, U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter on Hours Worked in Residential Care (Group Home) Establishments--Sleep Time and Related Issues-- Enforcement Policy (June 30, 1988), Exhibit 3,

U.S. Dep't of Labor, Wage & Hour Div., Field Assistance Bulletin on Exclusion of Sleep Time from Hours Worked for Domestic Service Employees (Apr. 25, 2016). *See also* Exhibit 4, U.S. Dep't of Labor, Wage & Hour Div., Field Operations Handbook § 31b20. Based on her time records and the interpretative guidance from the DOL, Plaintiff worked five consecutive days or nights, and thereby stayed at the VYH facility for an "extended period of time" each week.

## II.    THE SETTLEMENT AGREEMENT

The Parties negotiated a gross settlement amount payment of $85,000.00, to resolve any and all claims Plaintiff asserted, or could have asserted, in this lawsuit, including claims for unpaid wages, liquidated damages, attorneys' fees, or litigation costs. *See generally* Exhibit 1. As outlined in the Settlement Agreement, the Parties propose to distribute this sum as follows:

- $33,465.00 as compensatory and liquidated damages to Plaintiff; and

- $30,600.00 as an attorney's fee to Plaintiffs' counsel; and

- $20,935.00 as costs of the litigation.

*Id.*

Plaintiff's damage payment represent a fair and reasonable result because of the uncertainty of determining whether Defendant violated the FLSA, the uncertainty of Plaintiff's damages calculations, questions about Plaintiff's ability to prove the amount of hours she worked and was compensated for each week, consideration of Defendant's overpayment of compensation to Plaintiff, the effect of the statute of limitations on Plaintiff's damage claims and the putative class, and considerations associated with the risks, costs and delays of continued litigation. Furthermore, Plaintiff's payment represents a greater sum than she could recover at trial.

In return for these payments, Plaintiff will provide Defendant with a general release, including, but not limited to, releases from:

> [A]ny and all actual or potential claims, demands, actions, causes or
> action or liabilities, whether known or unknown, in law or equity,
> whether statutory or common law, or otherwise related to Plaintiff's
> wages and hours during her employment with Valley Youth House
> or any agreement concerning wages or hours during such
> employment, which Plaintiff ever had, now have, or could have,
> from the beginning of the world to the date of the respective
> Plaintiff's execution of this Settlement Agreement, including any
> and all wage and hour claims, any claims for unpaid wages or
> overtime pursuant to the FLSA or PWMA, any claims for failure to
> pay sleep time or off-the-clock work, and/or any claims that were or
> could have been asserted in the Lawsuit, including back pay, front
> pay, liquidated, compensatory, and punitive damages.

Exhibit 1, at ¶ 5.

## III.    THE COURT SHOULD APPROVE THE PARTIES' SETTLEMENT

### a.    <u>Legal Standard Governing Final Settlement Approval</u>

The Third Circuit has not provided any specific guidance on this issue; therefore, district

courts within this Circuit have looked to the Eleventh Circuit's opinion in *Lynn's Food Stores Inc.*

*v. United States*, 679 F.2d 1350, 1354 (11th Cir. 1982) for guidance.  *Kraus v. PA Fit II, LLC*, 155

F. Supp. 3d 516, 522–23 (E.D. Pa. 2016); *see also Bettger v. Crossmark, Inc.*, No. 1:13-CV-2030,

2015 WL 279754, at *3 (M.D. Pa. Jan. 22, 2015) ("Although the Third Circuit has not addressed

whether [FSLA] actions claiming unpaid wages may be settled privately without first obtaining

court approval, district courts within the Third Circuit have followed the majority position and

assumed that judicial approval is necessary.").  "Under *Lynn's Food,* '[w]hen parties present to the

district court a proposed settlement, the district court may enter a stipulated judgment if it

determines that the compromise reached 'is a fair and reasonable resolution of a *bona fide* dispute

over FLSA provisions' rather than 'a mere waiver of statutory rights brought about by an

employer's overreaching.'"  *Id.* at 523 (quoting *Lynn's Food Stores Inc.* 679 F.2d at 1354).  "The

Court will approve a settlement of FLSA claims if it settles a *bona fide* dispute and (1) the

settlement is fair and reasonable for the employee(s), and (2) the agreement furthers the FLSA's implementation in the workplace." *Solkoff v. Pennsylvania State Univ.*, 435 F. Supp. 3d 646, 652 (E.D. Pa. 2020) (internal quotations omitted).

### b.  The Parties' Settlement is Entitled to a Presumption of Fairness

In reviewing settlement agreements, the Third Circuit has "directed a district court to apply an initial presumption of fairness when reviewing a proposed settlement where: (1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir.2004) (internal quotations omitted).

The Parties' settlement is entitled to a presumption of fairness.  First, the Parties' Settlement Agreement is the result of arm's-length negotiations by experienced wage and hour counsel and an experienced mediator and retired U.S. Magistrate Judge.  The Parties' negotiations included consideration of the facts underlying Plaintiff's claims and Defendant's defenses, the realities of Defendant's financial condition, and a thorough assessment of the strengths, weaknesses, and risks inherent to the Parties' respective positions—all of which demonstrate the arm's length nature of the Parties proposed settlement and the absence of collusion on their negotiations.  Second, the Parties' settlement negotiations were informed by a thorough analysis of Defendant's time and pay data for all similarly situated RAs during the applicable period, as well as data relating to Defendant's liability and Plaintiff's entitlement to damages.  This production permitted an assessment of the proper shape of the potential class and allowed for an in-depth analysis of the strengths, weaknesses and risks inherent to the Parties' respective positions.  Finally, in consideration of the statute of limitations and Plaintiff's failure to certify a

class pursuant to Rule 23, the Parties reached an agreement to settle the claims for Plaintiff only, to which there are no objections. Accordingly, the Settlement Agreement must be viewed with an initial presumption of fairness.

### c. The Parties' Settlement Resolves a *Bona Fide* Dispute

Here, the Parties have a *bona fide* dispute based on the amount of compensation owed to Plaintiff and whether the amount of hours worked qualifies as "an extended period of time" under 29 C.F.R. §785.23 and related DOL guidance. "A settlement agreement involves a *bona fide* dispute if there are factual issues and not only legal issues, especially if the settlement reflects a reasonable compromise over an issue of fact such as the amount of back wages." *Solkoff*, 435 F. Supp. 3d at 653. The Parties have spent significant time and effort on discovery for purposes of settlement, including retaining experts, exchanging documents related to Defendant's liability and Plaintiff's entitlement to damages, and conducting extensive damages calculations for numerous employees. For over a year, the Parties spent countless hours and dollars analyzing 2-3 years' worth of daily time and payroll records for approximately 28 employees to calculate sleep time periods, overpayments and specific straight and overtime wages for each employee. Even after experts were retained, there remained a 17-employee discrepancy among the Parties regarding who should be included in the putative class, and a $97,169 disparity among experts regarding the amount of total exposure for the putative class. Had the Parties not been able to negotiate a settlement, their many disagreements would have become *bona fide* factual and legal disputes for the Court to resolve in addition to any future disputes concerning motions for FLSA certification, decertification, summary judgment, pre-trial evidentiary disputes, and jury instructions.

Further, considering the representations and recitals in the proposed Settlement Agreement, the Parties' proposed settlement represents a reasonable compromise of disputed claims. Plaintiff

alleged that Defendant failed to pay her, and similarly situated employees, overtime and straight time wages for uninterrupted, off the clock overnight hours spent at Defendant's facility.  *See* Complaint at ¶¶ 2, 15-16, 20, 44, 49 [Doc. No. 9].  As set forth in the Settlement Agreement, Defendant denies all liability, including that it violated the law in any manner alleged in the Complaint.  *See id. at* ¶¶ 2-3, 44-47, 50-52 [Doc. No. 9]; *see generally* Exhibit 1.  Accordingly, it is clear that the Parties' proposed Settlement Agreement represents a reasonable compromise of a *bona fide* dispute.

### d.  The Parties' Settlement Represents a Fair and Reasonable Resolution of Their Dispute

In determining the fairness of a proposed settlement, district courts in the Third Circuit consider the factors set forth in *Girsh v. Jepson*, 521 F. 2d 153, 157 (3d Cir. 1975).  *See also Sourovelis v. City of Philadelphia*, 515 F. Supp. 3d 321, 336 (E.D. Pa. 2021).  The nine *Girsh* factors to be considered include: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendant to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Girsh*, 521 F.2d at 157–58. This Court should approve the Parties' proposed settlement because, for the reasons discussed throughout this filing, all of the *Girsh* factors either weigh in favor of approval, or do not suggest the settlement is unfair.

**1. The settlement is fair, reasonable and adequate in light of the complexity, expense, and likely duration of the litigation.**

"The first factor 'captures the probable costs, in both time and money, of continued litigation.'" *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 437 (3d Cir. 2016) (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004)).  The settlement appropriately factored in the complexity, risk, expense, likely duration of the litigation and the range of reasonableness of the settlement in light of the best possible recovery – including the possibility that the lawsuit, if not settled, might not result in any recovery or might result in a recovery less favorable.  It also accounted for the uncertain outcome and the risk of dispositive motion practice and trial, as well as the difficulties and delays inherent in such litigation and the likelihood of protracted appellate review.  Namely, the Parties were able to reach a settlement before a class was certified that will provide Plaintiff with the maximum amount of damages that she could recover at trial.  Thus, the complexity, expense, and likely duration of the litigation support a finding that the Parties' proposed settlement is fair, reasonable and adequate.

### 2. The settlement is fair, reasonable, and adequate in light of the stage of the proceedings and the amount of discovery completed.

The third[4] *Girsh* factor tests whether Plaintiff had an adequate appreciation of the merits of the case before negotiating the proposed settlement.  *In re General Motors Corp. Pick-Up Trucks Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 813 (3rd Cir. 1995).  Throughout this litigation, Plaintiff's counsel engaged in a thorough effort to identify key issues, collect, exchange, and evaluate discovery informing their litigation positions and their damages calculation, and investigated applicable laws regarding the alleged claims and defenses.  The settlement was the product of well-informed judgments about the adequacy of the resolution, made when litigation

---

[4] The settlement benefits only Plaintiff.  The Court has not yet certified any class, conditionally or otherwise, so settlement with the named Plaintiff is permissible.  Therefore, the second *Girsh* factor (*i.e.,* reaction of the class) does not apply.  Nevertheless, Plaintiff approves this settlement.

advanced to a stage that Plaintiff's counsel could fairly and fully evaluate the value of the settlement.

### 3. The settlement is fair, reasonable, and adequate in light of the risks of establishing liability and damages.

"The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement. *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 319 (3d Cir. 1998). As at least one court has observed, a "bird in the hand in this litigation is surely worth more than whatever birds are lurking in the bushes." *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 838 (W.D. Pa. 1995).

Here, Plaintiff believes that she and other similarly situated RAs have a strong case that they are to be compensated for all sleep time hours spent at Defendant's facility because they were not required to be on duty for 24 hours or more, as stated in 29 C.F.R. § 785.22. However, Defendant contends that pursuant to 29 C.F.R. §785.23, DOL interpretative guidance and persuasive court opinions on the issue, Plaintiff is not entitled to compensation because she was at Defendant's facility for extended periods of time. Further, aside from the Parties' conflicting compensation amounts that may be owed to Plaintiff, the putative class significantly decreased in size to a possible 11 total members as many of the employees had non-qualifying schedules and were not as similarly situated as Plaintiff alleged. During the Parties' settlement negotiations, taking into consideration the time and pay analyses as well as information relating to Defendant's liability and Plaintiff's entitlement to damages, Plaintiff and Plaintiff's counsel considered all factors involved and believed it to be in their best interest to settle solely for Plaintiff. Based on the number of hours that Plaintiff worked during the relevant period and taking the statute of limitations into consideration without a certified class, the amount paid to Plaintiff is more than

reasonable and fair and actually exceeds the amount that would have been awarded if she was successful at trial.

Because of the disparity between their litigation positions, both Parties would have faced substantial risk and uncertainty if this litigation continued, including the significant expense associated with prosecuting and defending these claims and any appeals, and the disruption to their lives and business. Accordingly, without conceding any adverse conclusions would be correct or appropriate, both Parties believe that the settlement is fair, reasonable and adequate in light of the material risks associated with continued litigation.

### 4. The settlement is fair, reasonable, and adequate in light of the risks Plaintiff would face in maintaining the class action through trial.

The sixth *Girsh* factor requires the court to consider the risks of maintaining the class action through trial, including the likelihood of obtaining and maintaining class certification. *See Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011). Plaintiff entered into this Settlement Agreement cognizant of the risks of establishing liability and damages and maintaining this case on a collective basis through trial. Because "class certification is always conditional and may be reconsidered," Defendant would have vigorously opposed class certification and/or sought decertification throughout the trial. *See Reibstein*, 761 F. Supp. 2d at 254; *Saunders v. Berks Credit & Collections, Inc.*, No. CIV. 00-3477, 2002 WL 1497374, at *12 (E.D. Pa. July 11, 2002). Further, due to the very limited amount of class members who may qualify to be included in this action due to the variations in shifts (approximately 11 or less), there is a strong likelihood that Plaintiff would not receive class certification or be able to defeat Defendant's certification challenges. Under these circumstances, the sixth *Girsh* factor supports approval of the proposed settlement.

**5. The settlement is fair, reasonable, and adequate in light of Defendant's inability to withstand a greater judgment.**

The seventh *Girsh* factor takes into consideration Defendant's ability to withstand a greater judgment. "The Court believes this factor is most clearly relevant where a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement." *Reibstein*, 761 F. Supp. 2d at 254. Defendant is a non-profit organization servicing some of the most disadvantaged citizens in the Commonwealth and is not in a position to pay an exorbitant settlement. Despite Defendant's limited resources, the Parties continued to discuss ways to resolve this matter as outlined in their Settlement Agreement and were ultimately successful in doing so. Thus, this factor supports approval of the settlement.

**6. The settlement is fair, reasonable, and adequate in light of the best possible recovery and the attendant risks of further litigation.**

Finally, the eighth and ninth *Girsh* factors examine whether a proposed settlement is fair in light of the best possible recovery and the attendant risks of continued litigation. Plaintiff alleged that she worked and slept on VYH premises, but Defendant failed to compensate her for her uninterrupted sleep time hours. *See* Complaint at ¶¶ 2, 15-16, 20, 44, 49 [Doc. No. 9]. This settlement has the full support of Plaintiff and was reached after an in-depth analysis of the strengths, weaknesses and risks inherent to the Parties' respective positions. Plaintiff entered into the Settlement Agreement cognizant of the risks of establishing liability and damages and maintaining this case on a collective basis through trial. Defendant entered into the Settlement Agreement cognizant of the risks that it may be found liable for Plaintiff's alleged violations, the possibility that this case may proceed to trial on a collective basis, and that it may be held responsible for paying Plaintiff's damages. The Parties' Settlement Agreement is reasonable in light of the best possible recovery with consideration for all the attendant risks of litigation.

### e. **The Parties Settlement Furthers the FLSA Implementation in the Workplace**

"The FLSA was enacted for the purpose of protecting workers from substandard wages and oppressive working hours." *Lynn's Food Stores, Inc.*, 679 F.2d at 1352. "Judicial scrutiny of a private FLSA settlement agreement to ensure it is fair and reasonable to the employee is essential to accomplishing the FLSA's purpose." *Kraus*, 155 F. Supp. 3d at 526. Courts have rejected confidentiality provisions in FLSA settlement agreements as unreasonable; reasoning that such provisions unreasonably frustrate the implementation and purpose of the FLSA. *McGee v. Ann's Choice, Inc.*, No. CIV.A. 12-2664, 2014 WL 2514582, at *3 (E.D. Pa. June 4, 2014); *Brumley v. Camin Cargo Control, Inc.*, No. CIV.A. 08-1798 JLL, 2012 WL 1019337, at *7 (D.N.J. Mar. 26, 2012).

Here, the Parties did not include a confidentiality clause in the Settlement Agreement. *See* Exhibit 1. Therefore, the "public-private character" of employee rights under the FLSA is preserved, and the Settlement Agreement allows for the public to assure that employee wages are fair by virtue of public knowledge of the settlement. *Mabry v. Hildebrandt*, No. CV 14-5525, 2015 WL 5025810, at *3 (E.D. Pa. Aug. 24, 2015). Further, the Settlement Agreement's release clause is not impermissibly broad, but rather, is properly tailored to achieve a fair compromise for both Parties. *See* Exhibit 1 at ¶ 5. The Settlement Agreement provides that Plaintiff releases her claims from:

> [A]ny and all actual or potential claims, demands, actions, causes or action or liabilities, whether known or unknown, in law or equity, whether statutory or common law, or otherwise related to Plaintiff's wages and hours during his/her employment with Valley Youth House or any agreement concerning wages or hours during such employment, which Plaintiffs ever had, now have, or could have, from the beginning of the world to the date of Plaintiff's execution of this Settlement Agreement, including any and all wage and hour claims, any claims for unpaid wages or overtime pursuant to the FLSA or PMWA, any claims for failure to pay for off-the-clock

> work, and/or any claims that were or could have been asserted in the
> Lawsuit, including back pay, front pay, liquidated, compensatory,
> and punitive damages.

*Id.* at ¶ 5.  The Parties' release permissibly limits the scope of waiver and release provisions to

claims so that "[n]othing in this Settlement Agreement shall constitute a waiver of any rights to

enforce the terms of this Settlement Agreement or waiver of claims that cannot be legally waived

or of claims that arise after the date this Settlement Agreement is executed." *See Singleton v. First*

*Student Management, LLC*, No. CIV.A. 13-1744 JEI, 2014 WL 3865853, at *9 (D.N.J. Aug. 6,

2014) (finding waiver language "broad" yet "appropriate").  Accordingly, the release of claims is

legitimately limited to further the implementation of the FLSA and merits this Court's approval.

## IV.    Conclusion

For the reasons set forth above, and in all of the related papers submitted with this filing,

the Parties respectfully submit that the Court should grant the instant Motion and enter their

proposed Final Settlement Approval Order (Exhibit 5) approving their proposed settlement.

Respectfully submitted,

BY:    _s/ Jacqueline Gallagher_____
       Jacqueline K. Gallagher, Esquire
       Candace C. Hardy, Esquire
       O'Hagan Meyer, PLLC
       1717 Arch Street, Suite 3910
       Philadelphia, PA 19103
       T: 215-461-3300 / F: 215-461-3311


BY:    _s/ Edward Easterly_____
       Edward J. Easterly, Esquire
       Hoffman, Hlavac & Easterly
       1605 North Cedar Crest Blvd., Suite 517
       Allentown, PA, 18104
       T: 484-408-6001 / F: 484-408-6018

       *Attorneys for Defendant, Valley Youth House*

BY:      _s/ Adam Meshkov_____
              Adam D. Meshkov, Esquire
              Meshkov & Breslin
              830 Lehigh Street
              Easton, PA 18042
              T: 610-438-6300 / F: 610-438-6304


BY:      _s/ John Hollawell_____
              John W. Hollawell, Esquire
              4745 York Drive
              Orefield, PA 18069
              610-597-8835

              *Attorneys for Plaintiff, Gonja Yayla*

## <u>CERTIFICATE OF SERVICE</u>

I, Jacqueline K. Gallagher, hereby certify that on this day I filed the foregoing Joint Motion and Incorporated Memorandum of Law for Approval of the Parties' FLSA Settlement with the Clerk of the Court using the ECF system, which will send such filing to all attorneys of record.

*<u>/s/ Jacqueline K. Gallagher</u>*

Dated: <u>March 14, 2022</u>

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GONJA YAYLA, | : | |
| *Plaintiff*, | : | CIVIL ACTION NO. 5:20-CV-04395-EGS |
| | : | |
| v. | : | |
| | : | |
| VALLEY YOUTH HOUSE, | : | |
| t/a and/or d/b/a VALLEY YOUTH | : | |
| HOUSE COMMITTEE, INC., VALLEY | : | |
| YOUTH HOUSE ENDOWMENT | : | |
| FOUNDATION, and/or VALLEY | : | |
| YOUTH HOUSE, SPE, LLC[1] | : | |
| | : | |
| *Defendants*. | : | |

## SETTLEMENT AGREEMENT AND RELEASE

THIS SETTLEMENT AGREEMENT AND RELEASE, (the "Agreement") is made and entered into by and among GONJA YAYLA ("Plaintiff") and VALLEY YOUTH HOUSE ("VYH"), collectively "the Parties."

**WHEREAS**, Plaintiff has made certain allegations that she was not compensated at her regular or overtime rate of pay for uninterrupted overnight sleep periods in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (the "FLSA"), and the Pennsylvania Minimum Wage Act, 43 P.S. §§ 333.101, *et seq.* (the "PMWA"). Plaintiff claims that VYH failed to pay her and other similarly situated Resident Advisors straight time and/or applicable overtime wages for uninterrupted sleep time spent at a VYH facility. On November 19, 2020, Plaintiff filed an Individual, Collective and Class Action Second Amended Complaint in the United States District Court for the Eastern District of Pennsylvania styled, *Gonja Yayla, v. Valley Youth House t/a and/or d/b/a Valley Youth House Committee, Inc., Valley Youth House Endowment Foundation and/or Valley Youth House, SPE, LLC*, Case No. 20-CV-04395-EGS (herein, the "Action" or "Lawsuit");

**WHEREAS,** VYH denies Plaintiff's claims, denies any and all liability or wrongdoing of any kind whatsoever associated with any of the facts or claims alleged in this Lawsuit, and makes no concession or admission of wrongdoing or liability of any kind whatsoever; VYH maintains that all Resident Advisors are appropriately compensated pursuant to the U.S. Department of Labor regulations pertaining to sleep time exemptions set forth in 29 C.F.R. § 785.23 and the Pennsylvania Minimum Wage Act 43 P.S. §§ 333.101, *et seq.* ("PMWA").

---

[1]  Valley Youth House Committee and Valley Youth House SPE, LLC are incorrectly identified as "Valley Youth House Committee, Inc." and "Valley Youth House, SPE, LLC" in the caption. These two entities did not employ Yayla or any other potential class member. The entities have no assets and are improper parties to this case.

**WHEREAS**, the Parties have conducted independent investigations of the facts and law prior to and during the Lawsuit. Plaintiff's counsel and VYH's counsel have further analyzed the applicable law as applied to the facts discovered regarding Plaintiff's allegations, VYH's defenses and Plaintiff's damages;

**WHEREAS**, the Parties and their counsel have considered that, under the circumstances and in light of the costs, distractions to VYH's business, and the attendant risks of litigation, the Parties' respective interests are best served by compromise, settlement and dismissal of the claims against VYH with prejudice and have concluded that the terms of this Agreement are fair, reasonable and adequate;

**WHEREAS**, Plaintiff's counsel have analyzed and evaluated the merits of Plaintiff's claims, obtained and reviewed information relating to VYH's compensation policies, Plaintiff's job duties and responsibilities, and payroll data. Plaintiff's counsel has also taken into account the uncertain outcome and the risk of dispositive motion practice and trial, as well as the difficulties and delays inherent in such litigation and the likelihood of protracted appellate review. Based upon their evaluation of these and other factors, and recognizing the substantial risks of litigation, including the possibility that the Lawsuit, if not settled now, might not result in any recovery or might result in a recovery less favorable, Plaintiff's counsel is satisfied that the terms and conditions of this Agreement are fair, reasonable, and adequate, and in the best interest of Plaintiff in light of all known facts and circumstances. For purposes of this Agreement, Plaintiff's counsel also determined that the Agreement described herein is the best way to resolve the disputes among the Parties;

**WHEREAS**, VYH vigorously contests the allegations in the Lawsuit as VYH maintains that its Resident Advisors who are not compensated for sleep time hours are exempt from compensation pursuant to 29 C.F.R. § 785.23, 43 P.S. §§ 333.101, *et seq.* ("PMWA") and U.S. Department of Labor interpretative guidance found at: U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter on Hours Worked in Residential Care (Group Home) Establishments--Sleep Time and Related Issues-- Enforcement Policy (June 30, 1988); U.S. Dep't of Labor, Wage & Hour Div., Field Assistance Bulletin on Exclusion of Sleep Time from Hours Worked for Domestic Service Employees (Apr. 25, 2016); U.S. Dep't of Labor, Wage & Hour Div., Field Operations Handbook § 31b20. VYH denies that it committed any wrongful action or violation of law; however, VYH nonetheless believes that continued litigation against Plaintiff would be protracted, expensive and contrary to its best interests. Substantial amounts of time, energy, and other resources have been expended and, absent settlement, will continue to be devoted to VYH's defense of Plaintiff's claims. In light of these realities, VYH believes that the settlement memorialized in this Agreement is the best way to resolve the disputes among the Parties while minimizing its own further expenditures;

**WHEREAS**, the Parties agree to cooperate and take all reasonable steps necessary and appropriate to seek judicial approval of this Agreement, to effectuate all aspects of this Agreement, and to dismiss VYH as a Defendant from the Lawsuit upon approval.

**NOW THEREFORE**, the Parties, intending to be legally bound, and in consideration of the mutual promises herein contained and other good and valuable consideration, the sufficiency of which is hereby acknowledged, agree, subject to approval of the Court, as follows:

1.    **Payment of Money.**    As consideration for the promises and releases in this Agreement, VYH agrees to pay Eighty-Five Thousand and 00/100 Dollars (**$85,000.00**) (the "Gross Settlement Payment") to resolve the wage and hour claims Plaintiff presented in the Lawsuit as follows:

### A. Settlement Payments

No later than twenty-one (21) calendar days after the Court approves this Agreement, VYH shall issue two total checks, one check in the amount of **$33,465** payable to "Gonja Yayla" subject to applicable deductions and withholdings (as described in Section 3 below), and one check in the amount of **$51,535.00** payable to "Meshkov & Breslin" that is attributed to Plaintiff's attorneys' fees and costs and will not be subject to withholding or deduction but will be the subject of a Form 1099-MISC.   All checks will be mailed to Plaintiff's counsel, Adam D. Meshkov, Esquire, Meshkov & Breslin, 830 Lehigh Street, Easton, PA 18042.

2.    **Check Void Date.**    The check for Plaintiff's payment will become void and no longer available if not cashed within ninety (90) calendar days after originally issued.

3.    **Tax Liabilities.**    For tax purposes, 50% of the individual settlement payment to Plaintiff pursuant to Section 1(A) shall be treated as back wages and 50% of the individual settlement payment to each Plaintiff shall be treated as interest, liquidated damages and/or other non-wage relief.   Payments treated as back wages shall be made net of all applicable employment taxes, including, without limitation, federal, state, and local income tax withholding and the employee share of the FICA tax, and shall be reported to the Internal Revenue Service ("IRS") and the payee under the payee's name and Social Security number on an IRS Form W-2.   Payments treated as interest and/or liquidated damages shall be made without withholding and shall be reported to the IRS and the payee, to the extent required by law, under the payee's name and Social Security number on an IRS Form 1099.  The employee portion of all applicable income and payroll taxes will be the sole responsibility of Plaintiff.   Payment of attorneys' fees and costs pursuant to Section 1(A) shall be made without withholding and be reported to the IRS and to the payee under the payee's name and taxpayer identification number, which the payee shall provide for this purpose, on an IRS Form 1099.

VYH makes no representations, and it is understood and agreed that VYH has made no representations, as to the taxability of any portions of the settlement payments to Plaintiff or the payment of any costs or award of attorneys' fees.  Plaintiff is advised to seek their own tax advice. Neither Plaintiff's counsel nor Defendant's counsel intend anything contained herein to constitute legal advice regarding the taxability of any amount paid hereunder, nor will it be relied upon as such.

4.    **Approval Order and Dismissal.**

4.1    If the Court rejects the Settlement and/or this Agreement, fails to approve and enter the Approval Order in substantially the form submitted by the Parties, or fails to enter a final judgment, unless the Parties agree in writing, this Agreement shall be null and void and VYH shall have no obligations to make any payments under the Settlement or this Agreement.

4.2    A decision of the Court declining to approve any material condition of this

Agreement, which effects a fundamental change to the Parties agreement, shall render the entire Settlement voidable and unenforceable as to all Parties at the option of either Party. Each Party may exercise its option to void this Settlement by giving notice, in writing, to the other and to the Court within fifteen days of the Court's disapproval of any material condition, but in no event at any time after the Approval Order.

4.3    Unless the Parties agree in writing otherwise, in the event that the Agreement is not approved by the Court or the Agreement is revoked, terminated, cancelled, declared void or fails to become effective in accordance with its terms, or if there is no Approval Order, the Parties shall resume the Action at that time as if no Agreement had been entered. In such event, the terms and provisions of the Agreement shall have no further force and effect with respect to the Parties and shall not be used in this Action or in any other proceeding for any purpose, and any judgment or order entered by the Court in accordance with the terms of the Agreement shall be treated as vacated *nunc pro tunc*.

## 5.    <u>Released Claims.</u>

In consideration of the promises contained herein, and for other good and valuable consideration, Plaintiff, intending to be legally bound hereby, for herself and all of her dependents, heirs, executors, administrators, legal and/or personal representatives, successors, assigns, and agents, hereby unconditionally and irrevocably releases, acquits and forever discharges VYH, including VYH's parents, subsidiaries, affiliates, predecessors, successors, insurers, reinsurers and each of their respective officers, directors, employees, shareholders, trustees, partners, and any other related persons or entities, in their respective capacities as such (collectively, the "Releasees"), of and from any and all complaints, actions, liabilities, obligations, promises, agreements, controversies, damages, claims, causes of action, lawsuits, debts, judgments, awards, demands, costs, losses, rights, charges and/or expenses (including but not limited to attorneys' fees, costs and liquidated damages), of any nature whatsoever, asserted or unasserted, known or unknown, suspected or unsuspected, which she ever had, now has, or hereafter may have against the Releasees, arising at any time up through the effective date of this Agreement.

Without limitation of the foregoing general terms, this release includes any claims arising from or relating to Plaintiff's employment relationship with VYH and any other Releasee, whether or not asserted in the Lawsuit, and includes but is not limited to any and all claims arising from any alleged violation by any and all Releasees of any contract or of any federal, state, or local constitution, statute, ordinance or common law principle, including but not limited to employment discrimination or employment-related claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. §§ 1981, 1983 and 1985; the Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 *et seq.*, as amended by the Older Workers' Benefit Protection Act, Sections 1981 through 1988 of Title 42 of the United States Code; the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.*; the Family and Medical Leave Act, 29 U.S.C. § 1001 *et seq.*; the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.*; the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*; the False Claims Act, 31 U.S.C. § 3729 *et seq.*; the Equal Pay Act of 1963, 29 U.S.C. § 206 *et seq.*; the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 *et seq.*, the Pennsylvania Human Relations Act, 43 P.S. §

951 *et seq.*; the Pennsylvania Whistleblower Law, 43 P.S. § 1421 *et seq.*; the Pennsylvania Prevailing Wage Act, 43 P.S. § 165-1 *et seq.*; the United States Constitution; the Pennsylvania Constitution; any claims in tort, including but not limited to any torts related to actual physical harm, race-based, age-based, sexual or other workplace harassment, negligence, infliction of emotional distress, outrage, assault, battery, constructive discharge, defamation, breach of contract, interference with past, present or prospective contractual or business relationships, negligent hiring, supervision and retention, civil conspiracy, and tortious discharge in violation of public policy, including, but not limited to, retaliation for filing a workers' compensation claim; any claims for unpaid wages or overtime pursuant to the FLSA or PMWA, any claims for failure to pay for off-the-clock work, and/or any claims that were or could have been asserted in the Lawsuit, including back pay, front pay, liquidated, compensatory, and punitive damages; and any and all claims for legal fees or costs in connection with any of such claims. This release includes all claims involving any continuing effects of actions or practices which arose prior to the date of this Agreement and Plaintiff releases the use in any way of any past action or practice in any subsequent claim against Releasees.

Notwithstanding to the contrary above, nothing in this Agreement is intended to release, waive, or covenant not to sue upon (i) any claims that arise after the date on which Plaintiff executes this Agreement; (ii) any claims for breach of enforcement of this Agreement; (iii) any claims for vested non-forfeited benefit under any VYH benefit plan in which Plaintiff was a participant; (iv) any claims for continuation coverage under COBRA or similar state law; (v) any claims that cannot be released or waived by operation of law or private agreement; and (vi) any right to file a charge with or participate in an investigation conducted by a governmental agency; however, Plaintiff shall not receive any financial or pecuniary recovery as result of any investigation conducted by a governmental agency.

6. **No Admission of Liability.** VYH has denied and continues to deny, specifically and generally, the claims asserted in the Lawsuit, any and all liability or wrongdoing of any kind whatsoever associated with any of the facts or claims alleged in the Lawsuit. VYH maintains that Plaintiff was properly and fully compensated for all of the time she worked for VYH. Pursuant to Federal Rule of Evidence 408, neither the settlement memorialized in this agreement, nor any act performed or document executed in furtherance of the settlement memorialized in this Agreement: (a) may be used as an admission or evidence of, the validity of any claims released in this Agreement, or of any wrongdoing or liability of the Released Parties; or (b) may be used as an admission or evidence of, any fault or omission of the Released Parties, in any civil, criminal or administrative proceeding in any court, administrative agency, or other tribunal.

7. **No Eligibility for Reemployment.** The Parties agree that Plaintiff is not currently employed by VYH and that she is not eligible for reinstatement, rehire, future employment, or any employment or contract, consulting or advisor relationship with VYH or any of the Releasees, and that Plaintiff will not seek or accept any such relationship; and that VYH and all other Releasees are entitled to reject without cause any application, offer, or proposal made by Plaintiff.

8. **Neutral Reference.** If asked by prospective employers, VYH will provide a neutral employment reference for Plaintiff, including only her date of hire, date of separation, and her job title. VYH will indicate, if asked, that the release of further information is prohibited by company policy.

9.    **Non-Disparagement.**  Unless ordered by a Court of competent jurisdiction or otherwise required by law, Plaintiff agrees not to make or publish any disparaging statements to any person or entity about VYH and the Releasees as defined in Paragraph 5 or their business interests and affairs.  VYH and the Releasees also agree to use commercially reasonable efforts to cause those managers who directly supervised Plaintiff and who are employed by VYH at the time of execution of this Agreement not to make or publish any disparaging statements to any person or entity about Plaintiff.

10.    **Limited Disclosure.**  The Parties and their counsel agree that they will not issue any press releases announcing the Settlement.

11.    **The Court's Retention of Jurisdiction.**  Following its approval of the Agreement, the Court will retain jurisdiction to interpret, implement, and enforce the terms of the Parties' settlement and all orders and judgments entered in connection therewith.

12.    **Modification.**  This Agreement may not be changed, altered, or modified, except in writing and signed by counsel for the Parties and approved by the Court.  Any failure by any Party to insist upon the strict performance by the other Party of any of the provisions of this Agreement shall not be deemed a waiver of future performance of the same provisions or of any of the other provisions of this Agreement.

13.    **Entire Agreement.**  This Agreement constitutes the entire agreement between the Parties relating to any and all matters addressed in the Agreement (including settlement of the Lawsuit), and all prior or contemporaneous negotiations, agreements, understandings, representations, and statements, whether oral or written and whether by one of the Parties or such Parties' legal counsel, shall be deemed merged into this Agreement.  No rights hereunder may be waived or modified except in a writing signed by all Parties and approved by the Court.

14.    **Severability.**  Except as provided in Paragraph 4.2 above, the provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any one or more of its provisions shall not affect the validity or enforceability of any of the other provisions.

15.    **Arms' Length Transaction; Materiality of Terms.**  The Parties agree that the terms and conditions of this Agreement are the result of intensive, arms'-length negotiations between the Parties.  On February 4, 2022, the Parties participated in a full-day virtual mediation before an experienced mediator and retired U.S. Magistrate Judge, the Honorable Thomas J. Rueter (Ret.). Although the Parties were unable to reach a resolution at this time, with the continued assistance of the mediator, the Parties were ultimately able to reach an agreement memorialized here.  All terms and conditions of this Agreement are material to this Agreement and have been relied upon by the Parties in entering into this Agreement, unless otherwise expressly stated.

16.    **Choice of Law.**  This Agreement shall in all respects be construed, enforced and governed by and under the laws of the Commonwealth of Pennsylvania, without regard to choice of law principles, except to the extent that the law of the United States governs any matter set forth herein, in which case such federal law shall govern.

17.    **Construction.**  The determination of the terms and conditions of this Agreement has been by mutual agreement of the Parties.  Each Party participated jointly in the drafting of this

Agreement, and therefore the terms and conditions of this Agreement are not intended to be, and shall not be, construed against any Party by virtue of draftsmanship.

**18.    <u>VYH's Authority to Enter into Agreement.</u>**    The individual signing this Agreement on behalf of VYH represents and warrants that he/she is duly authorized to execute this Agreement on behalf of and to bind the entity.

**19.    <u>Signatures.</u>**  Signatures via facsimile or other electronic format will be treated as originals.  Signatures will not require a notary.  This Agreement may be signed in counterparts.

**IN WITNESS WHEREOF**, the undersigned have duly executed this Agreement as of the date indicated below:

APPROVED BY PLAINTIFF

Dated: _____          By:_____
                                                     Name:_____

APPROVED BY VALLEY YOUTH HOUSE

Dated: _____          By:_____
                                                     Name:_____

# EXHIBIT 2

**FLSA-1119**

June 30, 1988

<u>Hours Worked in Residential Care (Group Home) Establishments--Sleep Time and
Related Issues -- Enforcement Policy</u>

A major concern of employers operating residential care (group home) facilities
continues to be the issue of what constitutes working time (hours worked) for their
employees who are subject to the minimum wage and overtime pay provisions of the Fair
Labor Standards Act (FLSA). The duties of most employees of such residential care
facilities require them to remain on their employer's premises overnight. Although
permitted to sleep, group home employees are required to remain on the premises to be
available to clients in case of emergencies or personal crises. The employees are often
provided with private quarters and other amenities, which together can be characterized
as constituting a home-like environment.

The following enforcement policy statement is intended to assist employers and
employees by restating and clarifying the position of the Wage and Hour (WH) Division
with respect to certain sleep time and other hours worked issues. This statement will
provide further clarification and guidance as to the conditions under which WH, in its
enforcement of the FLSA, will not require that sleep time of such employees be
compensated.

<u>Background and Summary</u>

Since 1981, WH has issued a number of letters to representatives of the residential care
(group home) industry in response to their questions regarding sleep time. Employers
were advised that a special position with regard to sleep time had been adopted which is a
departure from the normal rules stated in Interpretative Bulletin, 29 CFR Part 785,
sections 785.20 through 785.23.

This special position allows "relief" employees who are provided with private quarters in
a home-like environment to be treated the same as "full-time" employees (i.e. those who
either reside on the employer's premises permanently or for "extended periods of time")
whom they relieve with respect to deducting sleep time. This special position was
developed out of concern for the apparent inequities of requiring compensation for sleep
time for relief employees but not for full-time employees being relieved who work under
identical conditions at the same facility.

An essential requirement for this special position is that a group home have <u>one or more
full-time employees</u> who either reside on the premises permanently or "for extended
periods of time" (IB 29 CFR 785.23). In a 1981 letter, WH took the position that residing
on the employer's premises <u>120 hours a week or 5 consecutive days or nights</u>, would
qualify an employee as residing on the premises for extended periods of time within the
meaning of IB section 785.23. Examples were given to illustrate what was meant by

extended periods of time: 9:00 a.m. Monday to 5:00 p.m. Friday; or 9:00 p.m. Monday until 9:00 a.m. Saturday (ignoring short periods of off-duty time during the day). Based upon a review of recent compliance actions by WH it has become clear that further guidance is necessary for employers and employees in the industry.

Enforcement Policy

The following terms which are used in the enforcement policy statement set forth below have caused some difficulty and are being defined for further guidance:

"day" - (except in the phrase "days and nights") means a 24-hour period during which an employee works (is compensated for) at least eight hours.

"workweek" - means seven consecutive 24-hour periods (29 CFR 778.105).

"on-duty" - means the period of time the employee is required to be on the employer's premises or otherwise working for the employer.

"private quarters" - means living quarters that are furnished; are separate from the "clients" and from any other staff members; have as a minimum the same furnishings available to clients (e.g. bed, table, chair, lamp, dresser, closet, etc.) and in which the employee is able to leave his or her belongings during on-and off-duty periods.

"home-like environments" - means facilities including "private quarters" as above and also including on the same premises facilities for cooking and eating; for bathing in private; and for recreation (such as TV). The amenities and quarters must be suitable for long-term residence by individuals and must be similar to those found in a typical private residence or apartment, rather than those found in institutional facilities such short-term facilities for travelers.

Under circumstances where an employee does not maintain his or her permanent residence on the premises and does not otherwise reside on the premises 7 days a week, WH will consider an employee who sleeps in private quarters, in a homelike environment, to reside on the premises for an extended period of time within the meaning of IB 785.23 if the employee resides on the premises for a period of at least 120 hours in a workweek.

WH is refining and restating the minimum conditions required to meet this rule. An employee will found to reside on the premises for extended periods of time if:

(1) the employee is on duty at the group home and is compensated for at least eight hours in each of five consecutive 24-hour periods; and

(2) the employee sleeps on the premises for all sleep periods between the beginning and end of this 120-hour period.

Any 24-hour period can be utilized, and the eight compensated hours per 24-hour period need not be consecutive. Thus, an employee who is on duty and compensated for the period 5:00 p.m. to 10:00 p.m. Monday, 6:00 a.m. to 9:00 a.m. and 3:00 p.m. to 10:00 p.m. Tuesday through Friday, and 6:00 a.m. to 9:00 a.m. Saturday,and who sleeps on the premises (10:00 p.m. to 6:00 a.m.) for all sleep periods from Monday night through Friday night, has been compensated for at least eight hours in five consecutive 24-hour periods between 5:00 p.m. Monday and 5:00 p.m. Saturday. The employee would also have slept five consecutive nights on the premises. Provided the other conditions were met, this would be considered to be residing on the premises for an extended period of time. Similarly, an employee who is on duty and is compensated from 6:00 a.m. to 9:00 a.m. and 5:00 p.m. to 10:00 p.m., Monday through Friday, and who sleeps Monday through Thursday nights on the premises, would be considered to reside on the premises for extended periods of time. For convenience, these employees are called "full-time" employees.

Where one or more employees meet the "full-time" employee/residing on the premises test, WH, as an enforcement policy, will likewise apply the provisions of IB 785.23 to one or more "relief" employees who reside on the premises for one to three nights, provided these employees are on duty and are compensated for at least eight hours in each 24-hour period in question and sleep on the premises all intervening nights. Although as a general matter it is anticipated that there will be no more than one relief employee for each full-time employee, it is possible that there may be more than one. However, to come within the provisions of this special enforcement policy, the relief employee must be relieving a full-time employee. That is, the full-time employee and the employee(s) relieving that employee may not be duty for more than a combined total of seven days and seven nights in each workweek. Furthermore, a part-time employee will not be considered a relief employee if that employee and the full-time employee being relieved are on duty simultaneously for more than one hour a day.

In order to deduct sleep time for full-time and relief employees, such employees must be provided private quarters in a homelike environment. Further, a reasonable agreement must be reached, in advance, regarding compensable time. The employer and the employee may agree to exclude up to eight hours per night of uninterrupted sleep time. They may also agree to exclude a period of off-duty time during the day when the employee is completely relieved of all responsibilities. These exclusions must be the result of an employee-employer agreement and not a unilateral decision of the employer. Such an agreement should normally be in writing to preclude any possible misunderstanding of the terms and conditions of an individual's employment.

Where sleep is to be deducted, the employer should determine if the following criteria are met:

(1) the employer and the employee have reached agreement in advance that sleep time is being deducted;

(2) adequate sleeping facilities with private quarters (see above) were furnished;

(3) if interruptions occurred, employees in fact got at lest five hours of sleep during the scheduled sleeping period;

(4) employees are in fact compensated for any interruptions in sleep; and

(5) no more than eight hours of sleep time is deducted for each full 24-hour on-duty period.

Sleep time may not be deducted for "relief" or other part-time employees who are not relieving a "full-time" employee (as defined above), unless such employees are themselves on duty for 24 hours or more as provided in IB 785.22. It should again be noted that an off-duty period (free-time) during a weekday for such employees "brakes" an on-duty period for the purposes of IB 785.22. For example, a duty period from 5:00 p.m. of one day to 5:00 p.m. the following day, during which an employee has uncompensated free time between 9:00 a.m. and 3:00 p.m. of the on-duty period, is not considered to be a 24-hour duty period.

<u>Interim Nonenforcement Policy</u>

With respect to suspended investigations of group homes, which were commenced before the date of this policy statement, WH is adopting a nonenforcement policy with regard to the payment of back wages resulting <u>only</u> from unpaid sleep time. This policy is being adopted in light of the apparent confusion and/or misunderstanding on the part of the industry with regard to the compensability of sleep time for employees employed in residential care facilities.

The employees involved in such suspended investigations will be advised of this limited nonenforcement policy. This limited nonenforcement policy will not be followed with respect to back wages resulting from any other violations of FLSA. WH will follow normal procedures with respect to other violations of FLSA.

WH will not initiate any new investigations of residential care facilities which involve only an assertion that improper sleep time deductions are being made by a group home until 90 days from the date of this enforcement policy statement.

This nonenforcement policy will not apply to any cases that the Department of Labor is currently litigating. Furthermore, nothing in this entire enforcement policy statement is intended to affect any employee's independent right under section 16(b) of FLSA to assert that sleep time is compensable.

# EXHIBIT 3



**U.S. Department of Labor**
Wage and Hour Division
Washington, D.C. 20210



April 25, 2016

FIELD ASSISTANCE BULLETIN No. 2016-1

| | |
|---|---|
| MEMORANDUM FOR: | REGIONAL ADMINISTRATORS AND DISTRICT DIRECTORS |
| FROM: | Dr. David Weil Wage and Hour Administrator |
| SUBJECT: | Exclusion of Sleep Time from Hours Worked by Domestic Service Employees |

This memorandum provides guidance to Wage and Hour Division (WHD) field staff regarding the exclusion of sleep time from the hours worked of domestic service employees. Specifically, it describes the broadly applicable rules governing under what circumstances an employer may exclude sleep time from an employee's hours worked under the FLSA and, if exclusion is permissible, how many hours may be excluded, with explanations and examples from the domestic service context.

## I.  Background

The Fair Labor Standards Act ("FLSA" or "Act"), 29 U.S.C. § 201 *et seq.*, is the federal law that requires covered employers to pay nonexempt employees at least the federal minimum wage for all hours worked and overtime compensation for all hours worked over 40 in a workweek. To comply with the FLSA's requirements, therefore, an employer must determine what time constitutes "hours worked."

Under most circumstances, time spent at a worksite (especially time during which an employee is required to be at the worksite) is considered hours worked under the FLSA. 29 C.F.R. 785.7 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)). In some circumstances, however, an employer may exclude time an employee spends sleeping at the worksite, even if the employee is required to be there, from the time for which an employee must be paid. 29 C.F.R. 785.20. The exclusion of sleep time from hours worked can be appropriate in any industry, and indeed has been the subject of previous guidance issued by the Wage and Hour Division regarding, for example, firefighters and care providers at residential facilities. *See, e.g.*, Wage & Hour Division Opinion Letter FLSA 2002-6, 2002 WL 3206596 (Aug. 13, 2002) (firefighters); Wage & Hour Memorandum – 88. 48 (June 30, 1988) ("1988 Memo") (residential care providers). This document focuses on domestic service, and in particular home care,

because the Application of the Fair Labor Standards Act to Domestic Service; Final Rule, 78 Fed. Reg. 60,454 (Oct. 1, 2013) ("Home Care Final Rule") extended FLSA protections to most home care workers in the United States, and therefore made the FLSA's sleep time rules newly applicable in the home care context.[1]  The Home Care Final Rule did not alter any of the Department's longstanding guidance concerning sleep time.  The sleep time rules described below apply to all employees, including home care workers (often referred to as "providers"), though the Department notes that the examples included below are specific to the home care context.  In all circumstances, "whether sleep time is work time 'is a question of fact,' which must be determined 'in accordance with common sense.'"  *Hultgren v. Cnty. of Lancaster, Neb*., 913 F.2d 498, 504 (8th Cir. 1990) (quoting *Cent. Mo. Tel. Co. v. Conwell*, 170 F.2d 641, 646 (8th Cir. 1948)).

## II.  Requirements for Excluding an Employee's Sleep Time from Hours Worked

The exclusion of sleep time from an employee's hours worked is only appropriate in certain circumstances.  In describing these circumstances, the relevant regulations place employees into three categories: those who reside at the worksite ("live-in" employees); those who work shifts of 24 hours or more; and those who work shifts of less than 24 hours.  *See* 29 C.F.R. 785.21-.23 (regulations regarding sleep time that apply broadly to all employees and distinguish between the three categories); *see also* 29 C.F.R. 552.102(a) (regulation addressing sleep time for live-in domestic service employees specifically).[2]

### *Live-in employees*

Certain sleep time rules apply to "live-in" employees, *i.e.*, employees who reside at their worksites, and in particular, live-in domestic service employees, *i.e.*, employees who reside at the private homes in or about which they provide household services.  An employee is deemed to reside at her worksite if she lives there on a "permanent basis," *i.e.*, stays there seven nights a week and has no other home, or for "extended periods of time," *i.e.*, works and sleeps there for

---

[1] The Final Rule narrowed the definition of "companionship services," a category of work that is exempt from FLSA protections, and prohibited third party employers from claiming the companionship services exemption regardless of a worker's duties.  78 Fed. Reg. 60,557 (codified at 29 C.F.R. 552.6, .109(a)).  It also prohibited third party employers of live-in domestic service employees from claiming the exemption from the Act's overtime compensation requirement that recipients of domestic services and their families or households may claim.  *Id.* (codified at 29 C.F.R. 552.109(c)).  These exemptions are relevant only in the context of domestic service employment, *i.e.*, services of a household nature that are performed in or about a private home.  *See* 29 C.F.R. 552.3.  Detailed information about the Final Rule, including the regulatory changes it made and the meaning of terms used in this FAB, including "private home," is available at http://www.dol.gov/whd/homecare/.

[2] Another regulatory provision, 29 C.F.R. 553.222, addresses the sleep time of employees in fire protection activities.  This memorandum does not address, and has no effect on, the portions of that provision that create slightly different sleep time rules only for such employees.

five days a week (120 hours or more) or five consecutive days or nights (regardless of the total number of hours). 78 Fed. Reg. 60,474; *see also* Field Operations Handbook ("FOH") § 31b20.

Employers of live-in employees, including live-in domestic service employees, may exclude sleep time from those employees' hours worked provided certain conditions are met: (1) the employer and employee have a reasonable agreement to exclude sleep time, 29 C.F.R. 785.23, and (2) the employer provides the employee "private quarters in a homelike environment," 1988 Memo.

*Reasonable agreement*. First, to exclude a live-in employee's sleep time from her hours worked, the employer and employee must have a reasonable agreement to exclude sleep time. 29 C.F.R. 785.23; 29 C.F.R. 552.102.[3]  The reasonable agreement "must be an employer-employee agreement and not a unilateral decision by the employer," and it "should normally be in writing in order to preclude any possible misunderstanding of the terms and conditions of an individual's employment." FOH § 31b18(b). WHD will accept "any reasonable agreement of the parties which takes into consideration all of the pertinent facts." 29 C.F.R. 785.23. In other words, the reasonable agreement should reflect the realities of the particular situation; sleep time may only reasonably be excluded, for example, if a home care employee regularly has the opportunity to sleep overnight, rather than if the employee is present to actively provide around-the-clock care.

*Private quarters in a homelike environment*. Additionally, to exclude a live-in employee's sleep time from her hours worked, an employer of a live-in domestic service employee must provide "private quarters in a homelike environment." *See* 1988 Memo (explaining this requirement in the residential care, rather than domestic service, context). "Private quarters" are a living and sleeping space that is separate from the person receiving services (often referred to as the "consumer") or any other employees. *See id.*; *see also Chao v. Jasmine Hall Care Homes, Inc.*, No. 2:05-cv-1306, 2005 WL 4591438, at *2-3 (E.D. Cal. Dec. 28, 2007) (deferring to WHD's guidance in prohibiting the employer of live-in workers in residential care facilities from excluding the employees' sleep time because the employees shared bedrooms). Although in most cases, "private quarters" will mean a separate bedroom, the sleep time requirements call for consideration of the particular circumstances of the case. For example, if the provider is a family or household member with whom the consumer already shared a residence before becoming a

---

[3] This is the same reasonable agreement discussed in Administrator's Interpretation 2014-1 regarding shared living arrangements, available at http://www.dol.gov/whd/opinion/adminIntrprtn/FLSA/2014/FLSAAI2014_1.pdf, which may exclude from paid time "normal private pursuits," not limited to sleeping, but also including, if the employer and employee so determine, "eating, . . . entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own." 29 C.F.R. 785.23; *see also* 29 C.F.R. 552.102 (explaining that a live-in domestic service "employee and the employer may exclude, by agreement between themselves, the amount of sleeping time, meal time and other periods of complete freedom from all duties when the employee may either leave the premises or stay on the premises for purely personal pursuits"; noting that to exclude off-duty time other than meal and sleep time, it must be "of sufficient duration to enable the employee to make effective use of the time"; and citing 29 C.F.R. 785.23).

paid caregiver, such as a spouse or domestic partner, the provider's existing arrangement will be considered private quarters. Or, solely in the context of a private home as opposed to at the site of a business operation, if a home care worker provides live-in services to an individual who does not have a residence with enough space to give the worker her own bedroom but the home is arranged in a manner designed to give the employee as much privacy as reasonably possible, that arrangement could fulfill this requirement. This space must be furnished with, at minimum, a bed, lighting, and a dresser and/or closet in which to store clothing and other belongings. *See* 1988 Memo. The employee must be able to leave her belongings in this room during on-duty and off-duty periods. *See id.* A "homelike environment" is a space that includes, in addition to the private quarters, facilities for cooking and eating, a bathroom, and a space for recreation. *See id.* These additional facilities may be shared by the provider and consumer and/or other household members. Wage & Hour Division Opinion Letter FLSA-1120 at 2 (June 25, 1990).

*Examples*. For example, an employee who provides home care services (such as a home health aide or personal care attendant) who has no other home and a consumer could live together in a two-bedroom apartment with a living room, kitchen with dining space, and bathroom. The consumer uses one of the bedrooms, and the provider uses the other, meaning she sleeps there and stores some of her personal possessions there. The provider's bedroom contains a bed, night table, dresser, two lamps, and a desk and chair. Both the consumer and provider use the living room, kitchen, and bathroom. The provider, consumer, and a third party home care agency that paired the two individuals and supervises the provider's work all signed a written agreement that, among other things, provides that the employee's hours worked will not include the hours between 11:00pm and 7:00am, when she sleeps except on the rare occasions the consumer needs assistance during the night. In these circumstances, because the employee has private quarters in a homelike environment and a reasonable agreement with her employers regarding the exclusion of sleep time, the consumer and the agency may (with the caveats explained below) exclude from the home care worker's hours worked the eight hours per night between 11:00pm and 7:00am.

In another example, an employee who provides home care services could spend five nights a week at the consumer's home, which is a one-bedroom apartment with a living room, kitchen and dining area, and bathroom. The provider and consumer did not know each other before the provider began providing services to the consumer. The provider, consumer, and a third party home care agency that paired the two individuals and supervises the provider's work all signed a written agreement that, among other things, provides that the employee's hours worked will not include the hours between 11:00pm and 7:00am, when she sleeps except on the rare occasions the consumer needs assistance during the night. If the employee sleeps on a pull-out couch in the living room while the consumer sleeps in her bedroom, keeps her bedding and belongings in a set of drawers that the consumer does not use, and has joint use of the kitchen and dining area and bathroom, the arrangement would likely qualify as providing the employee with private quarters in a homelike environment, and exclusion of sleep time would therefore be permissible (subject to the caveats explained below). But assume instead that the provider slept in a second bed in the consumer's bedroom because the consumer asked that rather than use separate space in the living room, the employee be close by to assist the consumer with toileting or medical tasks during the night. In that case, the provider would not have private quarters (and, depending on how frequently the consumer needed the provider's assistance during the night, the agreement

might not be reasonable), meaning the requirements for excluding sleep time would not be met, and the overnight hours would be compensable hours worked despite the parties' agreement.

### Shifts of 24 hours or more

Some employees who do not qualify as "live-in" employees under the FLSA work for shifts of 24 hours or more. As to those employees, including domestic service employees who work at private homes for shifts of 24 hours or more, an employer may exclude the employee's sleep time from hours worked if certain requirements—similar to but distinct from those for live-in employees—are met.[4] These requirements are that (1) the employee be provided "adequate sleeping facilities," (2) she "can usually enjoy an uninterrupted night's sleep," and (3) the parties have an "expressed or implied agreement" to exclude the sleep time. 29 C.F.R. 785.22(a); *see also* FOH § 31b12(a).

*Adequate sleeping facilities.* Although what constitutes "adequate sleeping facilities" for purposes of the first requirement of 29 C.F.R. 785.22(a) depends on the facts and circumstances of a particular living arrangement, an employer will have provided "adequate sleeping facilities" to a domestic service employee if the employee has access to basic sleeping amenities, such as a bed and linens; reasonable standards of comfort; and basic bathroom and kitchen facilities (which may be shared). *Cf., e.g.*, *Bridgeman v. Ford, Bacon & Davis*, 161 F. 2d 962, 963 (8th Cir. 1947) (noting that employees as to whom sleep time could be excluded lived in a building with "a dormitory, kitchen, toilet and shower room," "[t]he buildings were steam-heated and equipped with electric fans," the employees received "[c]omfortable beds, blankets, bed linens, and laundry service," and "[t]he kitchen was equipped with an electric refrigerator, range, sink, and utensils"); *Bowers v. Remington Rand*, 159 F. 2d 114, 115 (7th Cir. 1946) (noting that employees as to whom sleep time could be excluded were provided sleeping quarters that "consisted of large rooms with wooden or iron beds and mattresses" as well as "cooking facilities and utensils, bathing and toilet facilities, bedding and laundry service").[5]

---

[4] The regulatory provisions regarding a reasonable agreement to exclude sleep time, meal time, and other periods when an employee is engaged in private pursuits, 29 C.F.R. 785.23; 29 C.F.R. 552.102, apply only to live-in employees, not those who work 24-hour or longer shifts but do not reside at the worksite. In other words, the regulations contemplate one category of employees who reside at the worksite and are regularly present at it but not working, and another category that are typically working while present at the worksite but who work sufficiently long shifts that a sleep time exception to the FLSA's typical hours worked rules may apply.

[5] Context is important in making assessments such as whether sleeping facilities are adequate. In the home care context, in which employees work at residences, this description of what constitutes such facilities is apt. But this description does not foreclose the possibility that in other contexts—such as, for example, if an employee leads overnight camping excursions—different types of facilities could be adequate. *See* Wage & Hour Opinion Letter, 1987 WL 1369134 (February 20, 1987) (concluding that the exclusion of sleep time from hours worked was appropriate for leaders of two- to four-day camping trips who slept in tents).

5

Unlike for live-in domestic service employees, the sleeping area for employees who work shifts of 24 hours or more but do not qualify as live-in employees need not be private to meet the requirements for a sleep time exclusion from hours worked.  For example, a domestic service employee who lives in the home of her employer must be afforded private quarters if the employer wishes to exclude her sleep time from her hours worked, but the employer of a domestic service employee who works two 24-hour shifts at the home weekly need not provide the employee with private quarters in order to exclude her sleep time from hours worked.  This distinction reflects the importance of ensuring that an employee who lives and engages in personal pursuits at the worksite has sufficient amounts of privacy in order to appropriately treat some of her time there as non-compensable.

*Usually enjoy an uninterrupted night's sleep.*  The second requirement in 29 C.F.R. 785.22(a) for excluding the sleep time of an employee who works shifts of 24 hours or more is whether that employee "can usually enjoy an uninterrupted night's sleep."  This requirement is intended to limit the sleep time exception to those employees who are not required to perform work during a reasonable sleeping period the majority of the time.  As a reminder, WHD's sleep time regulations are an exception to the well-established general hours worked principles.

In this context, therefore, "an uninterrupted night's sleep" means at least five consecutive hours of sleep.  *Accord Roy v. Cnty. of Lexington, S.C.*, 141 F.3d 533, 546 (4th Cir. 1998); *Bouchard v. Reg'l Governing Bd. of Region 5 Mental Retardation Servs.*, 939 F.2d 1323, 1332 (8th Cir. 1991).  WHD believes this interpretation allows employers flexibility because it does not require that an employee have eight hours of uninterrupted time to consider the night "uninterrupted" but reflects the reality that a worker who is not permitted at least five hours in a row of uninterrupted time cannot be said to have gotten a meaningful night's sleep.[6]

An employee can "usually" get an uninterrupted night's sleep if an employer's interruptions that prevent her from getting five consecutive uninterrupted hours of sleep occur less than half the time.  *Compare Hultgren*, 913 F.2d at 506 (explaining that employees who slept at the residences of clients who were "prone to being up at night, often frequently, and on a consistent basis over time" did not usually enjoy an uninterrupted night's sleep); *with Rokey v. Day & Zimmerman*,

---

[6] Under 29 C.F.R. 785.22(a), the five hours of sleep must be continuous, whereas under 29 C.F.R. 785.22(b), described in more detail below, the five hours need not be continuous but rather may be the cumulative total of "reasonable periods" of sleep.  This distinction reflects the different purposes of these two provisions.  The standard in 29 C.F.R. 785.22(a) regards whether as a general matter the employee in question has a job in which the hours worked exception for sleep time can appropriately be applied, which is in part a question of whether the employee is typically able to sleep enough that it is generally reasonable to consider up to eight overnight hours as outside of her work time.  As to that issue, WHD believes five consecutive hours of sleep without interruption constitutes a meaningful night's sleep.  29 C.F.R. 785.22(b), on the other hand, addresses whether if the requirements of 29 C.F.R. 785.22(a) are met such that an employee's sleep time is usually excluded from her hours worked, on any particular night, that employee has gotten enough sleep to reasonably permit the exclusion of any portion of her regular sleeping period from her hours worked *on that night*.  As to individual nights rather than usual circumstances over time, WHD applies a less stringent standard, as described below.

157 F. 2d 736, 736 (8th Cir. 1946) (explaining, in allowing the exclusion of sleep time, that interruptions "[d]uring the [employees'] designated rest period" were "infrequent," *i.e.*, "there was on average less than one call per three months period for each" employee).  In other words, interruptions to an employee's five consecutive hours of sleep time by the employer that occur during half or more than half of an employee's shifts are too frequent to meet the requirement.  For example, if a home health aide is hired to work three 24-hour shifts each week for a consumer who needs regular monitoring at all times, including overnight, then it would not be appropriate for the employer to exclude any sleep the employee manages to get from her compensable hours worked.  On the other hand, if a home health aide works three 24-hour shifts for a particular consumer each week and the consumer wakes the aide for assistance on average during only one out of every three shifts, the requirement would be met.[7]

*Express or implied agreement*.  The third requirement of 29 C.F.R. 785.22(a), that the employer of an employee who works shifts of 24 hours or more and the employee have an "expressed or implied agreement" regarding the exclusion of sleep time, is not burdensome, because an agreement can be implied by the parties' conduct.  Wage and Hour Investigators should take into account, however, any evidence that the employee has objected to the exclusion of sleep time from her hours worked, which would indicate that there was no such agreement.

*Examples.*  Examples illustrate these principles.  A personal care attendant could be assigned by a home care agency to provide home care services to a consumer in the consumer's home from 7:00pm on Fridays until 9:00pm on Sundays.  The employee sleeps in a second bed in the consumer's bedroom, and she has use of the rest of the apartment, including the kitchen and bathroom.  During the six months this employee has worked for this consumer, the consumer has woken the employee up on both nights each weekend for assistance going to the bathroom, usually once around 1:00am and again around 3:00am.  Based on the agency's usual practice, the employee is not paid for the hours between 11:00pm and 6:00am, which are considered sleep time, and the employee has never objected to the exclusion of sleep time.  In these circumstances, sleep time is not properly excluded from the provider's hours worked.  The employee does not qualify as a live-in domestic service employee because she is only at the home for 50 hours per week over the course of three days and two nights.  Instead, she is a worker who is on duty for a shift of more than 24 hours.  Although her situation meets some of the threshold requirements for the exclusion of sleep time for such a worker—she has adequate sleeping facilities and the employer and employee have an implied agreement to exclude sleep time—because the employee is woken up every night she works such that she does not get five consecutive hours of sleep, she does not usually get an uninterrupted night's sleep.  Therefore, the agency and consumer may not exclude her sleep time from her hours worked despite their agreement to do so.  Because the circumstances do not meet the requirements for the exclusion

---

[7] In situations involving joint employment, *i.e.*, where a single employer sends a worker to 24-hour or longer shifts at multiple worksites, the joint employer must consider all of an employee's shifts together in assessing whether an employee can usually enjoy an uninterrupted night's sleep.  For example, if a home care worker provides services to more than one consumer on behalf of a single home care agency, the agency must consider all of the employee's shifts in aggregate in determining if this requirement is met.

of sleep time, none of the employee's time spent sleeping may be excluded from her hours worked, even on nights when the employee's sleep is not interrupted.

If instead the personal care attendant's job is as described but over the six months of employment, the consumer has woken the provider up for assistance going to the bathroom every other night around midnight, which usually takes about 15 minutes, the result would be different. In that case, the provider would "usually enjoy an uninterrupted night's sleep" because she gets at least five consecutive hours of sleep (at least 1:00am to 6:00am) during each shift.

### Shifts of fewer than 24 hours

As to an employee who does not live at her worksite and works shifts of fewer than 24 hours, an employer may not exclude any sleep time from hours worked, even if the employee is permitted to sleep while on duty.  29 C.F.R. 785.21; *see also Hultgren*, 913 F.2d at 506 (explaining that an employer of employees who were not on duty and not on call for six hours of their allegedly 24-hour shifts could not exclude sleep time from those employees' hours worked).  This general principle applies to domestic service employees, including home care workers.

For example, if a personal care attendant provides services to a consumer two nights a week from 7:00pm to 7:00am, even if the employee sleeps for some or most of that time, all of the time (two 12-hour shifts, for a total of 24 hours each workweek) must be treated as compensable hours worked.

## III. How Much Sleep Time Can Be Excluded

If the exclusion of sleep time is permissible as to a particular employee, the next question is the amount of sleep time that can be properly excluded from that employee's hours worked, in general and on any particular night.

### A.  Maximum number of hours

### Live-in employees, extended periods of time

An employer of a live-in home care worker who meets the definition of a "live-in" because she resides at the home for extended periods of time (and meets the additional requirements for the exclusion of sleep time as described above) may exclude from hours worked up to eight hours per night of sleep time as long as the employee is paid for at least eight hours during the relevant 24-hour period.  *See* 1988 Memo; Administrator's Interpretation 2014-1 at 17 n.22.  This position, which WHD has long held in the residential care context, applies equally in the domestic service context.  An employee who resides at her worksite fewer than seven nights a week almost certainly has another home and in the majority of cases therefore stays at the worksite in significant part for the employer's benefit.  Although some principles applicable to live-in employees who do not have another home (*i.e.*, who live at the worksite permanently) are still relevant, WHD believes that it should not be permissible for employers of domestic service employees who reside at the home for extended periods of time to treat no or only a small amount of time employees spend at the worksite as compensable hours worked.

For example, a home care provider could work and sleep at a private home from Monday through Friday each week. Because the consumer to whom she provides services attends a day program, the provider is off duty between 8:30am and 3:30pm. She and the family of the consumer have a written agreement regarding this off-duty time and under which the provider's sleep time, from 10:00pm to 6:00am, is excluded from hours worked. Her work time would therefore be nine hours per day (two and a half hours from 6:00am to 8:30am and six and a half hours from 3:30pm to 10:00pm). Because she is paid for more than eight hours in each 24-hour period, assuming the threshold requirements for excluding sleep time are met, the family can exclude all eight hours of the provider's sleep time (subject to the limitations described below).

The provider's schedule could change such that she did not begin her evening shift until 5:30pm and her sleeping period was for six hours, between 11:00pm and 6:00am. In that case, her work time would be eight hours per day (two and a half hours from 6:00am to 8:30am and five and a half hours from 5:30pm to 11:00pm). Because the provider is paid for eight hours in each 24-hour period, the family may exclude the six hours of sleep time (subject to the limitations described below).

There could be circumstances in which a provider who lives at the home for extended periods of time is on duty for eight hours or less in each 24-hour period, and the time is overnight and the employee usually sleeps during the shift. Because the employee must have at least eight hours worked before the exclusion of sleep time is permissible, in these circumstances, the employer may not exclude any sleep time hours from hours worked. *Cf.* Wage & Hour Division Opinion Letter FLSA-1120 at 1-2 (June 25, 1990); *see also* Administrator's Interpretation 2014-1 at 17 n.22.

*Live-in employees, permanent*

An employer of a live-in home care worker who meets the definition of a "live-in" because she resides at the home permanently (and meets the additional requirements for the exclusion of sleep time as described above) may exclude up to eight hours of sleep time each night as long as the employee is paid for some other hours during the workweek. Wage & Hour Division Opinion Letter FLSA 2004-7 at 3 (July 27, 2004). Administrator's Interpretation 2014-1 further explained this concept:

> Although the Department has not set a specific number of hours that must be compensated in order to permit the exclusion of the sleep time of an employee who resides on the premises permanently, the circumstances must be such that the agreement regarding work and non-work time is reasonable. A variety of agreements might meet this standard; providers' schedules will vary based on the particular arrangement and needs of the consumer, and there is no particular schedule necessary to make an agreement reasonable. For example, if a shared living provider and her employer agree to exclude eight hours of sleep time per night and the provider is paid an hourly rate for services she performs between the hours of 8:00pm and 10:00pm each evening and 6:00am and 8:00am each morning, that agreement would typically be reasonable. Or if a provider's sole responsibility is to be at the residence five nights a week from 10:00pm to

> 8:00am, it will likely be reasonable to agree to treat two of those ten hours as hours
> worked and exclude the remaining eight hours as sleep time.  Similarly, it will typically
> be reasonable to exclude sleep time during weeknights if the provider and employer agree
> that four hours per day spent in the residence on two weekdays and each weekend day are
> hours worked that must be compensated.  On the other hand, if a provider's sole
> responsibility is to be at the residence for eight hours each night, an agreement to exclude
> all time the provider is required to be on the premises will not be reasonable, nor would
> an agreement to consider one hour per day to be hours worked.

Administrator's Interpretation 2014-1 at 17-18.  WHD has not set a specific number of hours that
must be compensated for live-in employees who reside at the home permanently (in contrast to
live-in employees who only reside at the worksite for extended periods of time) in recognition of
the differences between employment arrangements of employees who reside permanently and
entirely at the worksite and those of employees who spend a significant amount of time at the
worksite but who have another home elsewhere.  An employee who resides permanently at her
worksite, and therefore does not have another home, is more likely to spend time at the worksite
engaged in purely personal pursuits than an employee who has another home to return to but
nonetheless spends significant amounts of time at the worksite.

Regardless of the details of the arrangement, sleep time excluded from the hours worked of a
home care worker who resides permanently at the home where she provides services must be
during normal sleeping hours, *i.e.*, overnight rather than during the daytime.  *Id.* at 18.

### Shifts of 24 hours or more

An employer of an employee who does not reside at the worksite but works shifts of 24 hours or
longer (and meets the additional requirements for the exclusion of sleep time as described above)
may exclude from the employee's hours worked no more than eight hours of sleep time in each
24-hour period.  29 C.F.R. 785.22(a).  These eight hours need not be at night, but they must
occur during a fixed window.  *Id.* (providing that sleep time must be "bona fide" and "regularly
scheduled"); FOH § 31b12(a) (referring to a "bona fide regularly scheduled sleeping period");
Wage & Hour Division Opinion Letter, 1987 WL 1369157, at *2 (Sept. 11, 1987) (explaining
in providing information about the exclusion of sleep time for employees who work shifts of more
than 24 hours that "[t]here is no specific requirement that the sleeping period must be after dark
and before daylight"); *see also H.W. Ariens v. Olin Mathieson Chemical Corp.*, 382 F.2d 192,
197-98 (6th Cir. 1967) (explaining that for 24-hour shifts, sleep time need not be overnight).

For example, if a home health aide provides home care services to a consumer in the consumer's
home from 7:00pm on Fridays until 9:00pm on Sundays, assuming the threshold requirements
for excluding sleep time are met, his employer could exclude from his hours worked a sleeping
period from 11:00pm to 5:30am (for a six-and-a-half hour sleeping period) or from 10:00pm to
6:00am (for an eight-hour sleeping period), but not from 10:00pm to 7:00am (for a nine-hour
sleeping period) or for eight-hour periods that vary each weekend.

*Shifts of fewer than 24 hours*

Employees to whom the FLSA applies who work shifts of less than 24 hours must be paid for all hours worked during the shift. 29 C.F.R. 785.21. No sleep time may be excluded even if the worker sleeps during the shift. *Id.*

### B. Limitations

Even when an employer is generally permitted to exclude an employee's sleep time from hours worked, there are certain limitations on an employer's ability to exclude all or part of sleep time during a particular sleeping period. These limitations apply in circumstances involving both live-in employees and employees who work shifts of 24 hours or more.

*Any interruption.* First, any interruption of what might otherwise be properly excluded sleep time by a call to duty must be treated as hours worked. 29 C.F.R. 785.22(b); 29 C.F.R. 552.102(a); *see also* 1988 Memo.

For example, if during a provider's sleeping period, a consumer calls out for a home care worker to assist him with going to the bathroom and the employee provides assistance for 20 minutes, those 20 minutes must be treated as paid time. Similarly, if a consumer is sick and the provider tends to her for two hours in the middle of the night, those two hours are hours worked even if they are within the provider's usual sleep time.

*Reasonable periods of sleep totaling five hours.* Second, if on a particular night the employee does not get reasonable periods of uninterrupted sleep totaling at least five hours, no sleep time may be excluded. 29 C.F.R. 785.22(b); 1988 Memo. Specifically, the WHD's longstanding position is that if an employee cannot get at least five hours of sleep in a sleeping period, the entire period must be counted as hours worked. *Id.*; *see also, e.g.*, Wage & Hour Division Opinion Letter FLSA 2002-6, 2002 WL 32406596, at *2 (Aug. 13, 2002); Wage & Hour Division Opinion Letter, 1998 WL 852808, at *1 (Mar 12, 1998); Wage & Hour Division Opinion Letter, 1993 WL 901151, at *1 (March 1, 1993). These five hours need not be continuous, but interruptions must not be so frequent as to prevent reasonable periods of sleep that add up to at least five hours. FOH § 31b12(b); *see also, e.g.*, Wage & Hour Opinion Letter, 1987 WL 1369158, at *1 (Sept. 11, 1987).[8]

For example, a live-in home care worker's regular sleep time could be from 11:00pm to 7:00am. If the consumer for whom she works wakes her up once at 4:30am for assistance taking medication, an interruption that lasts half an hour, those 30 minutes must be paid, but the remainder of the time—the five and a half hours from 11:00pm to 4:30am and the two hours from 5:00am to 7:00am—may be excluded as usual because the employee got reasonable periods of sleep totaling more than five hours. Similarly, if the consumer wakes the employee up at

---

[8] It is this interpretation of 29 C.F.R. 785.22(b)—that the five hours of sleep need not be continuous but can be the total of reasonable periods of sleep—that is not to be confused with the interpretation of 29 C.F.R. 785.22(a) that for purposes of that provision, an uninterrupted night's sleep means five consecutive hours. *See* footnote 6.

2:00am for assistance going to the bathroom, an interruption that lasts 15 minutes, those 15 minutes must be paid, but the remainder of the time—the three hours between 11:00pm and 2:00am and the four hours, 45 minutes hours between 2:15am and 7:00am—may be excluded from hours worked as usual because the employee got reasonable periods of sleep totaling more than five hours, even though no single period of five hours or more was uninterrupted.  In circumstances in which interruptions are more frequent, such as if the consumer needs the employee's services at 12:30am, 2:00am, 4:00am, 5:00am, and 6:00am for twenty minutes each time, the periods between interruptions are not reasonable periods of sleep, and the five-hour threshold will not be considered met.

## IV. Conclusion

It is often permissible for an employer of a home care worker who stays overnight in the home of the person receiving services to exclude the employee's sleep time from her hours worked, but the employer may only do so if the threshold requirements are met and to the extent described.

Please contact Derrick Witherspoon, Chief, Branch of FLSA/Child Labor at (202) 693-0715 with any questions.

*The following chart summarizes the information contained in FAB 2016-1.*

**Exclusion of Sleep Time from Hours Worked by Domestic Service Employees**

| | Live-in employee | | Shifts of 24 hours or more | Shifts of fewer than 24 hours |
|---|---|---|---|---|
| | **Extended periods of time** | **Permanent** | | |
| **Requirements for excluding an employee's sleep time from hours worked** | • Reasonable agreement to exclude sleep time<br>• Employer must provide private quarters in a homelike environment | | • Employer provides adequate sleeping facilities<br><br>• Employee can usually enjoy an uninterrupted night's sleep (5 consecutive hours)<br><br>• Express or implied agreement to exclude sleep time | Sleep time may not be excluded |
| **Maximum number of hours that can be excluded** | Up to 8 hours per night as long as the employee is paid for at least 8 hours during the 24-hour period | Up to 8 hours per night as long as the employee is paid for some other hours during the workweek | Up to 8 hours, in a fixed period, in each 24-hour shift | Sleep time may not be excluded |
| **Limitations on exclusion on a particular night** | • Any interruption to sleep time must be paid<br>• If during any night the employee does not get reasonable periods of uninterrupted sleep totaling at least 5 hours, the employer may not exclude any sleep time | | | |

# EXHIBIT 4

# Chapter 31

# HOURS WORKED[1]

Source: FOH Modernization revision 691, published 08/10/2016.  Substantive revisions made *after* 08/10/2016 are noted at the end of affected provisions below.  Historical information on revisions published *prior to* 08/10/2016 can be found at the link beside this chapter at **www.dol.gov/whd/foh/**.

## Table of Contents

**31a      PERIODS OF INACTIVITY**

31a00      Employees sent home for lack of work.
31a01      Rest periods.
31a02      Homeworker's waiting time.
31a03      Idle time during the normal workday while in travel status.

**31b      SLEEPING TIME AND CERTAIN OTHER ACTIVITIES**

31b00      Less than 24 hours duty.
31b01      Clothes changing and washup time where collective bargaining agreement makes no mention of practice.
31b02      Employees residing temporarily on employer's premises.
31b03      (Reserved.)
31b04      Radio announcers and performers.
31b05      Participation in athletic contests.
31b06      (Reserved.)
31b07      Knife sharpening.
31b08      Emergency government employment and disaster relief work.
31b09      Hours worked by truck drivers, including team drivers.
31b10      Medical treatment during normal workday.
31b11      Book review by newspaper, radio, or television employees.
31b12      Sleeping time.
31b13      Changing clothes at home.
31b14      On-call employees required to remain at home.
31b15      Fire and disaster drills.
31b16      Inspections under the Occupational Safety and Health Act of 1970.
31b17      Training courses and programs.
31b18      Employees residing on employers' premises: recording working time.
31b19      Hours of work for firemen and policemen.
31b20      Employees residing on the employer's premises for 5 days a week.
31b21      Meal periods for employees under section 7(k).
31b22      Fire fighters: time spent sleeping.
31b23      Meal periods of less than 30 minutes.

---

[1] This chapter supplements 29 CFR 785 and is not of itself a complete statement of the Wage and Hour Division (WHD)'s position on hours worked.

**31c**        **TRAVEL TIME**

      31c00        Employees required to perform duties while traveling.
      31c01        Operating employer's vehicle for employee's convenience.
      31c02        Driving employer's vehicle transporting other employees.
      31c03        Owner-drivers.
      31c04        Travel where heavy, burdensome equipment is carried.
      31c05        Homeworker's travel.
      31c06        Emergency calls.
      31c07        Travel by boat or helicopter.
      31c08        Layover or on-call time of drivers and helpers.
      31c09        Temporary help firms.
      31c10        Compensability of travel time of employees who voluntarily drive company vehicles between home and work sites.

**31d**        **SPECIAL PROBLEMS**

      31d00        Ambulance services.
      31d01        Community residences for individuals with intellectual or developmental disabilities, and others in need of custodial care.

**31a**        **PERIODS OF INACTIVITY**

**31a00**        <u>**Employees sent home for lack of work.**</u>

If an employee is told upon reporting for work that there is no work available and is immediately sent home, he or she will not be considered to have spent any time working.  If, however, the employee reports for work at the scheduled place at the prescribed time and is not immediately sent home but is suffered or permitted to wait for work after the regular shift was scheduled to begin, the time spent in waiting between the scheduled commencement of the shift and the time the employee starts work or is sent home is counted as working time.  Some employment agreements provide for the payment of a minimum number of hours pay to an employee on those occasions when he or she reports for work and none is available.  Pay arrangements of this kind are discussed in 29 CFR 778.220 -222.  *See* FOH 32d04.

**31a01**        <u>**Rest periods.**</u>

**(a)**        Rest periods of short duration, running from 5 minutes to about 20 minutes, are common in industry.  They promote the efficiency of the employee and are customarily paid for as working time.  They must be counted as hours worked.

**(b)**        Where a regular rest period of known duration is longer than 20 minutes, the waiting time rules apply.  In other words, if the employees are free to go where they please, and the rest period is long enough to permit the employees to use it for their own purposes, and if bona fide and not an attempt to evade or circumvent the Fair Labor Standards Act (FLSA) or Walsh-Healey Public Contracts Act (PCA), such periods are not hours worked.

**(c)**        Unauthorized extensions of authorized breaks are not counted as hours worked for an employee when the employer had expressly and unambiguously communicated to the employee that:

(1)      the authorized break may only last for a specific length of time;

(2)      any extension of such break is contrary to the employer's rules; and

(3)      any extension of such a break will be punished.

**31a02**    **Homeworker's waiting time.**

If the employer designates the exact time for reporting and the homeworker reports at that time and is compelled to wait, the time spent in waiting must be considered as hours worked. If the homeworker reports at a time which is not prearranged or at a time other than that specified by the employer and the employer is not prepared to accept the finished goods and charge out new material to the homeworker, the time spent in waiting will not be considered as hours worked.

**31a03**    **Idle time during the normal workday while in travel status.**

When employees are in travel status and the employer wishes to pay them for idle hours during which they normally would have worked had they been employed at their regular job and in their regular place of employment, we will respect the agreement of the parties and allow them to count the hours as hours worked.  The hours must be counted as hours worked in all respects and they must be taken into consideration when computing overtime.

**31b**      **SLEEPING TIME AND CERTAIN OTHER ACTIVITIES**

**31b00**    **Less than 24 hours duty.**

An employee who is required to be on duty for less than 24 hours is working even though permitted to sleep or engage in other personal activities when not busy.  For example, a telephone operator who is required to be on duty for specified hours is working even though permitted to sleep when not answering calls.  It makes no difference that facilities are furnished for sleeping.  The employee's time is given to the employer.  The employee is required to be on duty and the time is work time.

**31b01**    **Clothes changing and washup time where collective bargaining agreement makes no mention of practice.**

There are certain instances in which clothes changing and washup activities by employees on the premises of the employer are integral parts of the principal activities of the employees because the nature of the work makes the clothes changing and washing indispensable to the performance of productive work by the employees, but the collective bargaining agreement (CBA) in effect in the establishment is silent as to whether this time should be included in, or excluded from, hours worked.  Where such clothes changing and washup activities are the only pre-shift and post-shift activities performed by the employees on the premises of the employer, the time spent in these activities has never been paid for or counted as hours worked by the employer, and the employees have never opposed or resisted this policy in any manner although they have apparently been fully aware of it, there is a custom or practice under the CBA to exclude this time from the measured working time, and FLSA section 3(o) applies to the time.

(a)      **Clothes changing and washup time on a formula basis**

**CHAPTER 31 TABLE OF CONTENTS**

An employer may set up a formula by which employees are allowed given amounts of time to perform clothes changing and washup activities, provided the time set is reasonable in relation to the actual time required to perform such activities. The time allowed will be considered reasonable if a majority of the employees usually perform the activities within the given time.

**31b02**      **Employees residing temporarily on employer's premises.**

**(a)**      There are certain circumstances (usually at locations such as hard-to-reach construction jobs, isolated dredging barges and offshore drilling sites) where practical considerations make it necessary for employees to remain temporarily on the employer's premises and to eat and sleep there during their stay. In such situations, the employees shall not be considered as on "duty of 24 hours or more" if they have a regular schedule of hours and thereafter are relieved of duties except for extra work required by the exigencies of the job. Only the actual working time need be counted as hours worked.

**(b)**      The rules governing "duty of 24 hours or more" (*see* 29 CFR 785.22) are applicable where, from all the conditions of employment, including the understanding of the parties, it is clear that the employee is employed to wait rather than waiting to be employed. Among the factors which would support such a conclusion are:

     (1)      the employee has no regular schedule of hours, or a schedule in name only, and is required to perform work on a helter-skelter basis at any time during the day or night; or

     (2)      the employee has a regular schedule of hours but the unscheduled periods are so cut through with frequent work calls that this time is not his or her own.

**(c)**      Some employers, such as offshore oil well drilling contractors, arrange transportation to remote locations in such a way that two crews having regular work schedules as in FOH 31b02(a) above, arrive at the same time. One crew will ordinarily go to work immediately and the other must wait through an entire shift (or a substantial portion thereof) before starting work. At the end of the tour of duty at the worksite, one crew, after completing its last shift, must wait through the last shift (or a substantial portion thereof) of the other crew before crews are transported back from the worksite at the same time. Such waiting time on the initial and terminal days is as much an integral part of those particular 24-hour periods as the idle periods between the regular work shifts on the other workdays. Where the employees are not on call and are completely relieved of duty, such idle time on the initial and terminal days is not considered hours worked.

**31b03**      **(Reserved.)**

**31b04**      **Radio announcers and performers.**

Time spent by performers, including radio announcers on out-of-stretch (*see* FOH 32d08(a)) radio and television programs for which talent fees (as defined in 29 CFR 550) are paid, is not counted as hours worked provided the fee is sufficient to compensate for the straight time and overtime compensation which would normally be due for such time.

**31b05**      **Participation in athletic contests.**

**CHAPTER 31 TABLE OF CONTENTS**

As an enforcement policy, the WHD will not consider as hours worked under the FLSA or PCA any time spent by an employee as a participant in, or as an umpire, referee, scorer, or similar official in an athletic contest sponsored by the employer, if the participation of the employee in these activities is completely voluntary and if his or her regular employment is not conditioned upon participating in these activities.

**31b06**    **(Reserved.)**

**31b07**    **Knife sharpening.**

Knife sharpening activities of knifemen are an integral part of and indispensable to the various butchering activities for which they are employed.  The time so spent is compensable under the FLSA.

**31b08**    **Emergency government employment and disaster relief work.**

**(a)**    Since persons summoned or called upon by government or other public officials, pursuant to statutory authority, to engage in firefighting, national defense, civil defense, flood control, or other activities, become in legal effect employees of the state or Federal Government, the employer whose employees have been so engaged is not required to consider time spent in such activities as hours worked for the company during the workweek.  Any money paid for such activities need not be included in determining the regular rate.

**(b)**    Similarly, where contractors are specifically requested by federal, state, or local authority under the general police powers of the government concerned to furnish employees to render disaster relief services such as rescuing injured persons, restoring municipal services, clearing streets, and controlling damage, these contractors and their employees will be considered employees of the government and the FLSA applied in the same manner as in FOH 31b08(a) above.  Thus, the time spent on such work need not be counted as hours worked, and any compensation paid for such emergency work need not be included in the regular rate.  Such services are normally furnished without compensation to the contractor (or at cost) and the arrangement is terminated as soon as immediate needs are met.

**(c)**    If a contractor contracts with a government agency for work following a disaster, to be performed as a commercial venture or as part of his or her regular business activity (as distinguished from FOH 31b08(b) above), the FLSA shall be applied in the regular manner.

**31b09**    **Hours worked by truck drivers, including team drivers.**

**(a)**    **Time spent in sleeping berths in trucks**

Berths in trucks are regarded as adequate sleeping facilities for the purposes of 29 CFR 785.41 and 29 CFR 785.22.  However, this rule applies to sleeping berth time of truck drivers or helpers only when they are on continuous tours of duty during trips away from home for a period of 24 hours or more.  If the trip begins and ends at the home station and is performed within one working day (less than 24 hours), all time on duty on the truck is time worked (except, of course, for bona fide meal periods) even though some of that time is spent in the sleeping berth.  *See* FOH 31b00.

**(b)**    **Tours of duty of 24 hours or more but less than 48 hours**

**CHAPTER 31 TABLE OF CONTENTS**

FOH 31b12 and 29 CFR 785.22 describe excludable sleep time for hours of duty of 24 hours or more.  On continuous tours of duty of more than 24 hours but less than 48 hours, 1 extra hour of sleep time in excess of the maximum 8 hours may be claimed for each hour beyond *40* that a continuous tour of duty extends, provided that the employee has actually slept such number of hours.  For example, in a 42-hour continuous tour of duty, no more than 10 hours could be deducted for sleep time.  Similarly, in a 45-hour continuous tour, a maximum of 13 hours could be deducted.  However, in the absence of an express or implied agreement concerning the exclusion of sleep time, the time spent sleeping constitutes hours worked even though the tour of duty exceeds 24 hours.  *See* FOH 31b12.

**(c)**     **Continuous tours of duty**

(1)     As indicated in 29 CFR 785.12 -.16, waiting or layover time will be considered off-duty time and not part of the employee's hours of work if the employee is completely relieved of all duties and responsibilities, is permitted to leave the truck or temporary station to go anywhere, knows in advance that work will not resume until a specified time, and the period of layover is of sufficient length to be used effectively for the employee's own purposes.  Thus, no standard rule of thumb, such as "2-hour layover time" or "4-hour layover time" can be used to unequivocally state that a layover period of such length has automatically broken a continuous tour of duty.  Whether or not a continuous tour of duty greater than 24 hours is interrupted by a waiting or layover time is a question of fact.  For example, if a truck driver stops for a layover of 2 hours, but the stopping point happens to be in a remote location which has no available facilities (*e.g.*, restaurants, etc.), the tour of duty has not been interrupted and the "off-duty" time is compensable hours worked.

(2)     With regard to team truck drivers, because of the special circumstances under which they work, we would not regard a bona fide layover period as breaking a continuous tour of duty if the employer paid wages for that period.

(3)     Time spent in non-compensable bona fide meal periods and bona fide regularly scheduled sleeping periods would not break a continuous tour of duty provided that such periods do not exceed the maximum limitations in 29 CFR 785.22 and the "40-hour rule" set forth in FOH 31b09(b) above.  *See* FOH31b12.

**31b10**     **Medical treatment during normal workday.**

If an employer directs an employee, or any group of employees, to work beyond the regularly scheduled work shift, the normal workday of such employee, or group of employees, has been extended, and the same principle in 29 CFR 785.43 applies.

**31b11**     **Book reviews by newspaper, radio, or television employees.**

In some instances an employee of a newspaper, or radio or television station will read a particular book with the view to a possible book review story for use in the newspaper or on the air.  This presents no problem as to hours worked where the reading is done in the course of the employee's regular duties at the establishment or elsewhere at any time at the employer's specific request.  However, the reading may be done away from the employer's establishment and outside duty hours, such as at the employee's home in the evening, and on a speculative basis—that is, with the thought that a book review might be prepared.  In such cases there is a substantial question as to whether the reading was done for the benefit of the

employer or for the pleasure or information of the employee.  In such cases, the WHD will not assert that such reading is hours worked even though the book is subsequently reviewed in the newspaper or on the air.

**31b12**    <u>**Sleeping time.**</u>

**(a)**    **Background**

Regulations regarding the application of hours worked principles to sleeping time appear at 29 CFR 785.20 -.23, as well as at 29 CFR 552.102, which is specific to live-in domestic service employees.  Field Assistance Bulletin No. 2016-1, Exclusion of Sleep Time from Hours Worked by Domestic Service Employees, provides additional guidance regarding those regulatory provisions, much of which is broadly applicable.  This chapter describes those general principles; however, because the scenarios are derived from the field assistance bulletin, they are nearly exclusively from the domestic service context.

**(b)**    **Duty of less than 24 hours**

As to an employee who does not live at his or her worksite and works shifts of fewer than 24 hours, an employer may not exclude any sleep time from hours worked, even if the employee is permitted to sleep while on duty.  *See* 29 CFR 785.21 and Field Assistance Bulletin No. 2016-1.

<u>Scenario:</u>

A home care worker provides services to a person with a disability two nights a week from 7:00 p.m. to 7:00 a.m.  Even if the employee sleeps for some or most of that time, all of the time (*i.e.*, two 12-hour shifts, for a total of 24 hours each workweek) must be treated as compensable hours worked.

**(c)**    **Duty of 24 hours or more**

If an employee is required to be on duty 24 hours or more, the employer may exclude a bona fide, regularly scheduled sleeping period of 8 hours or less from hours worked if certain requirements are met.  These three requirements are that the employee be provided adequate sleeping facilities, the employee can usually enjoy an uninterrupted night's sleep, and the employer and employee have an expressed or implied agreement to exclude the sleep time from hours worked.  *See* 29 CFR 785.22(a) and Field Assistance Bulletin No. 2016-1.

(1)    *Adequate sleeping facilities are furnished by the employer*

Whether an employer has provided adequate sleeping facilities to an employee depends on the facts and circumstances of a particular arrangement.  In general, an employer must ensure that the employee has access to basic sleeping amenities, such as a bed and linens, reasonable standards of comfort, and basic bathroom and kitchen facilities.  The designated sleeping area and other facilities can be shared or private.

Context is important in making assessments of whether sleeping facilities are adequate.  This general description applies in the domestic service context and may apply in many other contexts, but it does not foreclose the possibility that in other circumstances (*e.g.*, if an employee leads overnight camping excursions) different

types of facilities could meet this requirement.  *See* 29 CFR 785.22(a) and Field Assistance Bulletin No. 2016-1.

<u>Scenario:</u>

A personal care attendant is assigned by a home care agency to provide home care services to a consumer in the consumer's home from 7:00 p.m. on Fridays until 9:00 p.m. on Sundays.  The employee sleeps in a second bed in the consumer's bedroom, and he or she has use of the rest of the apartment, including the kitchen and bathroom.  This employee has adequate sleeping facilities.

(2)    *The employee can usually enjoy an uninterrupted night's sleep (i.e., 5 consecutive hours)*

An employee can "*usually enjoy an uninterrupted night's sleep*" if an employer's interruptions that prevent him or her from getting 5 consecutive, uninterrupted hours of sleep occur less than half the time.  Interruptions to an employee's 5 consecutive hours of sleep that occur during half or more than half of an employee's shifts are too frequent to meet this requirement.  *See* 29 CFR 785.22(a) and Field Assistance Bulletin No. 2016-1.

<u>Scenario 1:</u>

If a home health aide is hired to work three 24-hour shifts each week for a consumer who needs regular monitoring at all times, including overnight, then it would not be appropriate for the employer to exclude any time the employee manages to sleep from his or her compensable hours worked because the employee cannot usually enjoy an uninterrupted night's sleep.

<u>Scenario 2:</u>

If a home health aide works three 24-hour shifts for a particular consumer each week, and on average the consumer wakes the aide for assistance during only one out of every three shifts, the requirement that the aide can usually enjoy an uninterrupted night's sleep would be met.

(3)    *There is an expressed or implied agreement to exclude sleep time*

The requirement to have an expressed or implied agreement regarding the exclusion of sleep time can be fulfilled by a written or oral agreement, or implied by the parties' conduct.  No such agreement exists where an employee has objected to the exclusion of sleep time from his or her hours worked.  *See* 29 CFR 785.22(a) and Field Assistance Bulletin No. 2016-1.

<u>Scenario:</u>

An employee has been employed for approximately 3 months and is required to work shifts of 24 hours or more.  Based on the employer's usual practice, the employee is not paid for the hours between 11:00 p.m. and 6:00 a.m., which are considered sleep time, and the employee has never objected to the exclusion of sleep time.  The employer and employee have an implied agreement to exclude sleep time.

**CHAPTER 31 TABLE OF CONTENTS**

(4)    *Amount of sleep time that can properly be excluded*

An employer of an employee who does not reside at the worksite, works shifts of 24 hours or longer, and meets the additional requirements for the exclusion of sleep time, may exclude from the employee's hours worked no more than 8 hours of sleep time in each 24-hour period.  *See* 29 CFR 785.22(a).  These 8 hours need not be at night, but they must occur during a fixed window.  *See* 29 CFR 785.22(a); WHD Opinion Letter FLSA (September 11, 1987); and Field Assistance Bulletin No. 2016-1.

Scenario:

If a home health aide provides home care services to a consumer in the consumer's home from 7:00 p.m. on Fridays until 9:00 p.m. on Sundays, assuming the threshold requirements for excluding sleep time are met, his or her employer *could exclude* from his or her hours worked a sleeping period, for example, from 11:00 p.m. to 5:30 a.m. (*i.e.*, for a 6.5-hour sleeping period) or from 10:00 p.m. to 6:00 a.m. (*i.e.*, for an 8-hour sleeping period), but may not exclude sleep time when he or she works from 10:00 p.m. to 7:00 a.m. (*i.e.*, for a 9-hour sleeping period) or for 8-hour periods that vary each weekend.

**(d)    Live-in employees**

Certain sleep time rules apply to "live-in" employees, who are employees who reside at their worksites, including live-in domestic service employees (*i.e.*, employees who reside at the private homes in or about which they provide household services).  An employee is deemed to reside at his or her worksite if he or she lives there either on a "permanent basis," meaning that he or she stays there 7 nights a week and has no other home, or stays for "extended periods of time," meaning that he or she works and sleeps there for 5 days a week (*i.e.*, 120 hours or more) or 5 consecutive days or nights, regardless of the total number of hours.  *See* 78 FR 60474, FOH 25n02(a), and FOH 31b20.

Employers of live-in employees may exclude sleep time from those employees' hours worked provided the following conditions are met: the employer and employee have a reasonable agreement to exclude sleep time, and the employer provides the employee private quarters in a homelike environment.  *See* 29 CFR 785.23, Wage and Hour Memorandum – 88.48 (June 30, 1988), and Field Assistance Bulletin No. 2016-1.

(1)    *Reasonable agreement*

The reasonable agreement "must be an employer-employee agreement and not a unilateral decision by the employer," and it "should normally be in writing in order to preclude any possible misunderstanding of the terms and conditions of an individual's employment" (FOH 31b18(b)).  Note: the WHD will accept "any reasonable agreement of the parties which takes into consideration all of the pertinent facts" (29 CFR 785.23).  In other words, the reasonable agreement should reflect the realities of the particular situation.  For example, sleep time may only reasonably be excluded if an employee regularly has the opportunity to sleep overnight, rather than if the employee is present to actively perform around-the-clock work.  *See* Field Assistance Bulletin No. 2016-1.

**CHAPTER 31 TABLE OF CONTENTS**

(2)     *Private quarters in a homelike environment*

To exclude a live-in employee's sleep time from his or her hours worked, an employer must provide private quarters in a homelike environment. *See* Field Assistance Bulletin No. 2016-1 and Wage and Hour Memorandum – 88.48 (June 30, 1988).

"Private quarters" are a living and sleeping space that is separate from the person receiving services or any other employees. Although in most cases "private quarters" will mean a separate bedroom, the sleep time requirements call for consideration of the particular circumstances of the case. For example, if a home care worker is a family or household member with whom the person receiving services already shared a residence before becoming a paid caregiver (*e.g.*, a spouse or domestic partner), the worker's existing arrangement will be considered private quarters. Or, solely in the context of a private home as opposed to at the site of a business operation, if a home care worker provides live-in services to an individual who does not have a residence with enough space to give the worker his or her own bedroom, but the home is arranged in a manner designed to give the employee as much privacy as reasonably possible, that arrangement could fulfill this requirement. *See* Wage and Hour Memorandum – 88.48 (June 30, 1988) and Field Assistance Bulletin No. 2016-1.

A "homelike environment" is a space that includes, in addition to private quarters, facilities for cooking and eating, a bathroom, and a space for recreation. These additional facilities may be shared by the provider and consumer and/or other household members. *See* Wage and Hour Memorandum – 88.48 (June 30, 1988); WHD Opinion Letter FLSA (June 25, 1990); and Field Assistance Bulletin No. 2016-1.

Scenario:

An employee, who provides home care services and has no other home, and a consumer live together in a two-bedroom apartment with a living room, kitchen with dining space, and bathroom. The consumer uses one of the bedrooms, and the provider uses the other, meaning he or she sleeps there and stores some of his or her personal possessions there. The provider's bedroom contains a bed, night table, dresser, two lamps, a desk, and a chair. Both the consumer and provider use the living room, kitchen, and bathroom. The provider, consumer, and a third party home care agency, which paired the two individuals and supervises the provider's work, all signed a written agreement that, among other things, provides that the employee's hours worked will not include the hours between 11:00 p.m. and 7:00 a.m. when he or she sleeps, except on the rare occasions the consumer needs assistance during the night. In these circumstances, because the employee has private quarters in a homelike environment and a reasonable agreement with his or her employers regarding the exclusion of sleep time, the consumer and the agency may exclude from the home care worker's hours worked the 8 hours per night between 11:00 p.m. and 7:00 a.m spent sleeping.

(3)     *Amount of sleep time that can be excluded for an employee who resides at the worksite on a permanent basis*

If a domestic service employee resides at the private home that is his or her worksite on a permanent basis (*i.e.*, has no other home), the employer and employee may agree to not count more than 8 hours per night as sleep time as long as the employee is paid for some other hours during the workweek. Although the Department of Labor (DOL) has not set a specific number of hours that must be compensated in order to permit the exclusion of the sleep time of an employee who resides on the premises permanently, the circumstances must be such that the agreement regarding work and non-work time is reasonable. A variety of agreements might meet this standard, as workers' schedules will vary based on the particular arrangement and needs of the person receiving services; there is no particular schedule necessary to make an agreement reasonable. *See* Administrator Interpretations Letter FLSA 2014-1 and Field Assistance Bulletin No. 2016-1.

Scenario 1:

If a live-in home care worker and his or her employer agree to exclude 8 hours of sleep time per night, and the employee is paid an hourly rate for services he or she performs between the hours of 8:00 p.m. and 10:00 p.m. each evening and 6:00 a.m. and 8:00 a.m. each morning, that agreement would typically be reasonable.

Scenario 2:

If a live-in home care worker's sole responsibility is to be at the residence 5 nights per week from 10:00 p.m. to 8:00 a.m., it will likely be reasonable to agree to treat 2 of those 10 hours as hours worked and exclude the remaining 8 hours as sleep time.

Scenario 3:

It will typically be reasonable to exclude sleep time during weeknights if a live-in home care worker and his or her employer agree that 4 hours per day spent in the residence on 2 weekdays and each weekend day are hours worked that must be compensated.

Scenario 4:

If a live-in home care worker's sole responsibility is to be at the residence for 8 hours each night, an agreement to exclude all time the employee is required to be on the premises will not be reasonable, nor would an agreement to consider only 1 hour per day to be hours worked.

(4)     *Amount of sleep time that can be excluded for an employee who resides at the worksite for extended periods of time*

If a domestic service or residential care employee resides at his or her worksite for an extended period of time (*i.e.*, does not live there exclusively but meets the residency requirements), the employer and employee may agree to not count more than 8 hours per night as sleep time as long as the employee is paid for at least 8 hours during the 24-hour period. *See* Field Assistance Bulletin No. 2016-1 and Administrator Interpretations Letter FLSA 2014-1.

Scenario 1:

**CHAPTER 31 TABLE OF CONTENTS**

A home care worker works and sleeps at a private home from Monday through Friday each week.  Because the consumer to whom he or she provides services attends a day program, the provider is off duty between 8:30 a.m. and 3:30 p.m.  He or she and the family of the consumer have a written agreement regarding this off-duty time and under which the provider's sleep time, from 10:00 p.m. to 6:00 a.m., is excluded from hours worked.  His or her work time would therefore be 9 hours per day (*i.e.*, 2.5 hours from 6:00 a.m. to 8:30 a.m. and 6.5 hours from 3:30 p.m. to 10:00 p.m.).  Because the provider is paid for more than 8 hours in each 24-hour period, assuming the threshold requirements for excluding sleep time are met, the family can exclude all 8 hours of the provider's sleep time (subject to the limitations described below).

Scenario 2:

The schedule of the home care worker in Scenario 1 changes such that he or she does not begin her evening shift until 5:30 p.m. and his or her sleeping period is for 7 hours, between 11:00 p.m. and 6:00 a.m.  In this case, his or her work time is 8 hours per day (*i.e.*, 2.5 hours from 6:00 a.m. to 8:30 a.m. and 5.5 hours from 5:30 p.m. to 11:00 p.m.).  Because the provider is paid for 8 hours in each 24-hour period, the family may exclude the 7 hours of sleep time (subject to the limitations described below).

**(e)**    **Interruptions to sleeping time**

(1)    *Any interruption*

As to an employee who is on duty for 24 hours or more or a live-in employee, any interruption by a call to duty of what might otherwise be properly excluded sleep time must be treated as hours worked.  *See* 29 CFR 785.22(b), 29 CFR 552.102(a), and Field Assistance Bulletin No. 2016-1.

Scenario 1:

During a home care worker's sleeping period, a consumer calls out for assistance with going to the bathroom.  The employee provides that assistance for 20 minutes.  Those 20 minutes must be treated as paid time.

Scenario 2:

A person receiving services is sick, and the home care worker tends to him or her for 2 hours in the middle of the night.  Those 2 hours are hours worked even if they are within the provider's usual sleep time.

(2)    *Reasonable periods of sleep totaling 5 hours*

If an employee cannot get at least 5 hours of sleep in a sleeping period, the entire period must be counted as hours worked.  These 5 hours need not be 5 continuous, uninterrupted hours of sleep, but interruptions must not be so frequent as to prevent reasonable periods of sleep that add up to at least 5 hours.  If interruptions are so frequent as to prevent reasonable periods of sleep totaling at least 5 hours, the entire period must be considered hours worked.  *See* 29 CFR 785.22(b); FOH 31b12(b);

WHD Opinion Letter FLSA (September 11, 1987); and Field Assistance Bulletin No. 2016-1.

Scenario 1:

A live-in home care worker's regular sleep time is from 11:00 p.m. to 7:00 a.m.  If the person for whom he or she works wakes his or her up once at 4:30 a.m. for assistance taking medication, an interruption that lasts half an hour, those 30 minutes must be paid; however, the remainder of the time (*i.e.*, the 5.5 hours from 11:00 p.m. to 4:30 a.m. and the 2 hours from 5:00 a.m. to 7:00 a.m.) may be excluded as usual because the employee got reasonable periods of sleep totaling more than 5 hours.

Scenario 2:

A live-in home care worker's regular sleep time is from 11:00 p.m. to 7:00 a.m.  If the person receiving services wakes the home care worker up at 2:00 a.m. for assistance going to the bathroom, an interruption that lasts 15 minutes, those 15 minutes must be paid; however, the remainder of the time (*i.e.*, the 3 hours between 11:00 p.m. and 2:00 a.m. and the 4 hours, 45 minutes between 2:15 a.m. and 7:00 a.m.) may be excluded from hours worked as usual because the employee got reasonable periods of sleep totaling more than 5 hours, even though no single period of 5 hours or more was uninterrupted.

Scenario 3:

If the person receiving services needs the employee's assistance at 12:30 a.m., 2:00 a.m., 4:00 a.m., 5:00 a.m., and 6:00 a.m. for 20 minutes each time, the periods between interruptions are not reasonable periods of sleep, and therefore the 5-hour threshold will not have been met.

[01/13/2017]

**31b13**   **Changing clothes at home.**

Employees who dress to go to work in the morning are not working while dressing even though the uniforms they put on at home are required to be used in the plant during working hours.  Similarly, any changing which takes place at home at the end of the day would not be an integral part of the employees' employment and is not working time.

**31b14**   **On-call employees required to remain at home.**

Where an on-call employee performs services for his employer at home and yet has long periods of uninterrupted leisure during which he or she can engage in the normal activities of living, the WHD will accept any reasonable agreement of the parties for determining the number of hours worked.  As an example, this policy will apply to an on-call employee who is required by the employer to remain at home to receive telephone calls from customers when the company office is closed.  The agreement should take into account not only the actual time spent in answering the calls but also some allowance for the restriction on the employee's freedom to engage in personal activities resulting from the duty of answering the telephone.

**CHAPTER 31 TABLE OF CONTENTS**

**31b15**      **Fire and disaster drills.**

Time spent by employees in participating in fire or other disaster drills, whether voluntary or involuntary or during or after regular working hours, is considered substantially to the benefit of the employer and therefore is compensable hours of work.  Of course, such time may be compensated at the applicable statutory minimum wage rather than the employees' regular rates.

**31b16**      **Inspections under the Occupational Safety and Health Act of 1970.**

**(a)**      Section 8(e) of the Occupational Safety and Health Act of 1970 (OSH Act) provides that:

(1)      during an inspection under that act an authorized representative of the employees shall be given an opportunity to accompany the Occupational Safety and Health Administration (OSHA) investigator; *or*

(2)      where there is no authorized employee representative, the OSHA investigator shall consult with a reasonable number of employees concerning health and safety at their workplace.

**(b)**      Time spent by an employee accompanying the OSHA investigator as in FOH 31b16(a)(1) above is not considered hours worked.  Section 8(e) of the OSH Act does not require that an employee representative accompany the investigator, nor does it impose a duty on the employer to require an employee to accompany the investigator.  Such time spent by an employee is considered voluntary and primarily (although not wholly) for the benefit of the employees.

**(c)**      Time spent by employees consulting with the OSHA investigator as in FOH 31b16(a)(2) above during their normal workday when required to be on the employer's premises is hours worked.

**31b17**      **Training courses and programs.**

29 CFR 785.27 -.31 contains guidelines for determining whether attendance or participation by employees in training courses and programs constitute hours worked (*see* FOH 10b11).  Certain training plans may require as a condition of promotion within an occupational classification or to a higher classification, the satisfactory completion of a prescribed course of study.  Attendance at or participation in such courses will be considered voluntary where the existing classification level or working conditions are not adversely affected by an employee's decision not to participate.

**31b18**      **Employees residing on employers' premises: recording working time.**

**(a)**      Where there is a "reasonable agreement" between employer and employee pursuant to 29 CFR 785.23, such an agreement establishes the hours the employee is considered to work, but precise recordkeeping regarding hours worked is not required.  The employer may keep a time record showing the schedule adopted in the agreement and indicate that the employee's work time generally coincided with the agreement or schedule.  If it is found by the parties that there is significant deviation from the initial agreement, a new agreement should be reached reflecting the actual facts.

**CHAPTER 31 TABLE OF CONTENTS**

**(b)**    The "reasonable agreement" must be an employer-employee agreement and not a unilateral decision by the employer. Such an agreement should normally be in writing in order to preclude any possible misunderstanding of the terms and conditions of an individual's employment. It must take into account not only the time spent working but also the time when the employee may engage in normal private pursuits, with sufficient time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he or she may leave the premises for personal reasons. The agreement must also consider such relevant factors as the degree to which the use of the employee's personal time is limited or restricted by the conditions of employment and the extent of interruption to eating and sleeping periods. However, whether an employee is free to use time for personal pursuits will depend on the facts in each case, notwithstanding the provisions of any written agreement.

**31b19**    **Hours of work for firemen and policemen.**

The rules on hours of work for firemen and policemen are covered in 29 CFR 553, subpart C, "Fire Protection and Law Enforcement Employees of Public Agencies." *See* FOH 31b21 -22.

**31b20**    **Employees residing on the employer's premises for 5 days a week.**

**(a)**    The "reasonable agreement" referred to in 29 CFR 785.23 may apply to an employee who resides on the employer's premises 5 days a week, since such employee may be considered as residing on the employer's premises "for extended periods of time." *See* 29 CFR 552.102.

**(b)**    Ordinarily, an employee residing on the employer's premises for 120 hours or more in a week would meet the requirements of FOH 31b20(a) above. Where less than 120 hours in a week are spent residing on the employer's premises, 5 consecutive days or nights would also qualify as residing on the premises "for extended periods of time." For example, employees who are on duty from 9 a.m. Monday until 5 p.m. Friday would also be considered to reside on the employer's premises. Even though on duty for less than 120 hours, they are on duty for 5 consecutive days (Monday through Friday). The fact that they sleep over only 4 nights does not alter this conclusion. Similarly, employees who are on duty from 9 p.m. Monday until 9 a.m. Saturday would also be considered to reside on their employer's premises since they are on duty for 5 consecutive nights (Monday night through Friday night).

**31b21**    **Meal periods for employees under section 7(k).**

Pursuant to 29 CFR 553.15(a), where an employee employed under section 7(k) is on duty 24 hours or less, a meal time may not be excluded from hours worked in the usual circumstance. However, where such an employee is completely relieved from duty during the meal period, and is *not* required, for example, to remain in radio contact, such an employee would be *off duty* during this period and such time would not be included in hours worked for purposes of section 7(k).

**31b22**    **Fire fighters: time spent sleeping.**

Under 29 CFR 553.222(c), where an employer and employee had agreed that time spent sleeping be compensable, the employer cannot make unilateral changes in the agreement in order to exclude sleep time from compensable hours of work and then consider the employee's continued employment to be acceptance of such change. Some form of uncoerced mutual assent is necessary to consider the parties' agreement validly changed.

**CHAPTER 31 TABLE OF CONTENTS**

29 CFR 553.222(c) does not address the converse (*i.e.*, the procedure for making sleep time compensable where there was previously an expressed or implied agreement to exclude such time from compensable hours of work). Consequently, an employee could unilaterally withdraw his or her consent and the employer would then be required to compensate the employee for any future sleep time that may occur. However, the employer would not be *required* to agree to a continuation of the same terms and conditions of employment. The employer and employee would be free to establish new conditions of employment, such as rate of pay, hours of work, or reassignment. Where employees are represented for collective bargaining purposes, such changes in the terms or conditions of employment could be addressed within the collective bargaining process. Non-represented employees would be left to private agreement between the employer and themselves.

### 31b23    Meal periods of less than 30 minutes.

Bona fide meal periods are not worktime. Bona fide meal periods do not include coffee breaks or time for snacks. Ordinarily 30 minutes or more is long enough for a bona fide meal period.

Meal periods of less than 30 minutes during which the employee is completely relieved for purposes of eating a meal may be bona fide– and thus not hours worked– when certain special conditions are present (*see* 29 CFR 785.19). The conditions reviewed to make this determination, which should be considered in context on a case-by-case basis, include:

**(a)**    Work-related interruptions to the meal period are sporadic and minimal.

**(b)**    Employees have sufficient time to eat a regular meal. Periods less than 20 minutes should be given special scrutiny to ensure that the time is sufficient to eat a regular meal under the circumstances presented. The period involved is not just a short break for snacks and/or coffee but rather is a break to eat a full meal, comes at a time of the day or shift that meals are normally consumed, and occurs with no more frequency than is customary.

**(c)**    There is an agreement (*e.g.*, a CBA) between the employees and employer that the period of less than 30 minutes is sufficient to eat a regular meal.

**(d)**    Applicable state or local laws do not require lunch periods in excess of the period indicated.

### 31c    TRAVEL TIME

### 31c00    Employees required to perform duties while traveling.

In the case of employees required to travel several days and to perform active duty while traveling, such as feeding or watering cattle sent to market by rail or the like, it is difficult to determine the exact hours worked. Under these circumstances, any reasonable agreement entered into between the employer and the employee, or established by custom or practice, which takes into account the amount of time required for active labor by the employee and the fact that the employee is subject to call 24 hours a day, will be acceptable.

### 31c01    Operating employer's vehicle for employee's convenience.

**(a)**    In certain situations, an employee is responsible for a vehicle and its equipment and for having it at the worksite at the proper time. The employer may permit the employee to drive

the vehicle to and from home.  In situations of this type where the permission is granted for the employee's own convenience and the travel is within the normal commuting distance of employees in the area, time spent in driving is not hours worked.

**(b)**    Where the vehicle is also used in connection with emergency calls outside of normal working hours, a determination must be made as to whether the use of the vehicle is in fact for the convenience of the employee or primarily for the benefit of the employer.  The frequency of emergency calls may indicate for whose convenience or benefit the vehicle is being used.

**31c02**    **Driving employer's vehicle transporting other employees.**

**(a)**    Driving time is not considered hours worked in instances where an employee elects to transport other employees to and from work and such employee is driving the employer's vehicle for his or her own convenience.

**(b)**    On the other hand, where the driver is directed by the employer to report to the company warehouse, garage, or yard as a pickup point, then time spent driving the employees from such point to the workplace is hours worked.

**(c)**    Drivers of vanpools need not be paid for time spent transporting other employees to and from work under the following conditions:

(1)    The transportation provided must be primarily for the benefit of participating employees.

(2)    Participation in the program is entirely voluntary and employees are free to accept or reject the arrangement at any time.

(3)    The employee-driver is chosen by the participating employees.

(4)    The pickup times and route are established by the participating employees.

(5)    The employer has virtually no control over the arrangement.

**31c03**    **Owner-drivers.**

**(a)**    Whether the time spent in caring for a team of horses, or for a truck, and driving to and from the job site outside the employee's workday is hours worked, depends on the nature of the hiring agreement.

**(b)**    If under the agreement the employer has no right to possession of the team or truck away from the job site but has merely hired the use of the team or truck for the daily working period at the job site, beginning after the delivery there of the harnessed team or the truck by the owner and ending when the owner leaves with his team or truck, the employer obviously has no responsibility for the team or truck outside this period, and cannot direct what is to be done in the way of caring for it, or how, where, or by whom it shall be readied for work.  In such an event, the care and transportation of the team or truck would be engaged in by the owner and not as an employee of the employer.  Under these circumstances, time spent in those activities outside the employee's workday at the job site would not be hours worked.

**CHAPTER 31 TABLE OF CONTENTS**

**(c)**    On the other hand, if the agreement between the employer and the employee contemplates outright hire of the team or truck for a period of time so that the owner employee is caring for the team or truck and transporting it as a mere custodian for the employer to whom it is rented, the time so spent by the employee is hours worked.

**(d)**    In these situations, a determination of hours worked cannot be made unless the Wage and Hour Investigator (WHI) ascertains exactly the terms of the agreement between the employer and the employee.

**31c04**    **Travel where heavy, burdensome equipment is carried.**

**(a)**    Travel time spent in carrying heavy burdensome equipment, as contrasted with light hand tools, is hours worked.  On the other hand, carrying light hand tools between an employee's home and his work site, involving no appreciable burden or inconvenience, is not hours worked.  In determinations of this kind, some consideration must be given to the custom in the industry.  For example, it is not a part of a carpenter's principal activities for him to carry his usual tool box, containing hammer, saw, et cetera, from his home to his work site.

**(b)**    An employee who is required regularly to carry heavy mail or bulky packages to the post office en route from the factory to his or her home, is working.  A different situation exists if an employee carries only light mail to and from the post office on the way to or from work, and generally the time so spent is not hours worked.

**31c05**    **Homeworker's travel.**

The time spent by homeworkers in traveling to and from the employer's premises (or other pickup/dropoff point) to obtain work-related materials or equipment and/or to deliver finished products, is primarily for the employer's benefit and must be included in the total hours worked by homeworkers.  Where such trips are combined with personal errands (*e.g.*, grocery shopping or visits with friends), the time spent in such personal pursuits is excluded from the total travel time for the trip in calculating hours worked.

Note: the back wage recovery period, as a result of non-compliance with this position, shall not extend back beyond the date of this insert (08/08/1988).

**31c06**    **Emergency calls.**

**(a)**    Normal travel from home to work is not worktime.  However, there may be instances when travel from home to work is worktime.  For example, if an employee who has gone home after completing his or her day's work is subsequently called out at night to travel a substantial distance to perform an emergency job for one of his or her employer's customers, all time spent on such travel is working time.  However, where an employee is given prior notice, as for example, he or she is told on Friday that he or she will be required to work at a customer's place of business on Saturday, it will not be considered as an emergency call outside his or her regular working hours.

**(b)**    The WHD is taking no position on whether travel to the job and back home by an employee who receives an emergency call outside of his regular hours to report back to his regular place or places of work to do a job is working time.   Therefore, such time will no longer be counted as hours worked.  In the event that a position on this type of travel is again adopted the provisions of FOH 52f07(a)(1) will apply to past violations on any such positions.

**CHAPTER 31 TABLE OF CONTENTS**

**31c07**    **Travel by boat or helicopter.**

Time spent in travel by boat or helicopter from a dock or heliport to an offshore drilling rig and return by employees engaged in offshore drilling for oil is a preliminary and postliminary activity. As such, it must be counted as hours worked under section 4(b) of the Portal-to-Portal Act to the extent that it is compensable by contract, custom or practice. Thus, if all of the time spent in such travel is paid for, all of it must be counted as hours worked. On the other hand, where payment is made for a portion of the time spent in such travel, only that portion of the travel time which has been made compensable must be counted as hours worked. In this respect, where a partial payment is made and the employer's records do not indicate the portion of the travel time that is to be compensated the intent of the parties and all the facts and circumstances surrounding the agreement or understanding will determine what portion of the travel time has been made compensable.

**31c08**    **Layover or on-call time of drivers and helpers.**

**(a)**    29 CFR 785.15 -.17 are applicable to layover or on-call time of truck drivers and helpers. It makes no difference whether such employees are at home or at some other location.

**(b)**    On the other hand, the travel time rule stated in 29 CFR 785.39 does not apply to such employees even if they are away from home overnight but applies only to employees who, as passengers on an airplane, train, boat, bus, or automobile engage in travel which keeps them away from home overnight. However, *see* FOH 31b09.

**31c09**    **Temporary help firms.**

The typical temporary help firm (such as Peakload, Inc. and Manpower, Inc.) is engaged in supplying workers employed by the firm on an as needed basis to various establishments. A person who desires employment usually registers with the temporary help firm. For certain types of jobs the registrant usually voluntarily shows up at some central location where he or she awaits employment opportunity. If work is available or becomes available, he or she is sent or taken to the customer's establishment. If accepted by the customer, he or she remains and performs the work of that employer. At the end of the day, the worker is free to go home and collect his or her pay later or to return to the central location to be paid for his or her work. The circumstances vary. If the employment understanding clearly is that the pay or the time of the employee begins and ends at the customer's establishment, waiting for assignments at the central location or in travel from there to the customer's establishment and return would not be compensable worktime. In other words, his or her working time is computed in the same manner as if he or she had gone directly from his or her home to the customer's establishment and returned home from there at the end of the day. This would be true even though he or she may be assigned to work at the same customer's establishment for more than one day.

**31c10**    **Compensability of travel time of employees who voluntarily drive company vehicles between home and work sites.**

**(a)**    **Background**

(1)    In some industries employers utilize somewhat modified vans or trucks for use by employees who perform service work at a customer's home or business establishment. The vehicle provides a necessary means for the employee to transport

needed parts, tools, equipment, etc., to various work sites during the day.  The employer may give employees the opportunity to drive the vehicle between home and work on a voluntary basis.

(2)    In some instances, the employee starts the work day by calling the employer's dispatcher from home, receiving one or more work assignments to begin the work day, and traveling directly from home to the first work site rather than traveling first to the employer's establishment and then to the work site.  At the end of the day the employee may be required to call the employer's dispatcher to advise that the last service call for the day has been completed and that the employee is leaving the last work site for home, where the employee parks and locks the vehicle.  During this call to the dispatcher, the employee may or may not receive assignments for the next day.

(3)    The WHD policy on the compensability of travel time in such situations was set forth in WHD Opinion Letter FLSA (August 5, 1994).  In light of the concerns expressed by both employers and employees, and the possible effects of applying this interpretation in a wide variety of industries, the Secretary of Labor, on October 19, 1994, deferred any WHD efforts to enforce the policy in that opinion letter while a review was undertaken.

**(b)    Policy**

WHD Opinion Letter FLSA-1302 (April 3, 1995) withdrew WHD Opinion Letter FLSA (August 5, 1994), and set forth the WHD's position in this matter.  Accordingly, where the following circumstances exist, time spent traveling between the employee's home and the first work site of the day and between the last work site of the day and the employee's home need *not* be compensated:

(1)    Driving the employer's vehicle between the employee's home and customers' work sites at the beginning and end of the workday is *strictly voluntary* and not a condition of employment

(2)    The vehicle involved is the type of vehicle that would normally be used for commuting

(3)    The employee incurs no costs for driving the employer's vehicle or parking it at the employee's home or elsewhere

(4)    The work sites are within the normal commuting area of the employer's establishment

## 31d    SPECIAL PROBLEMS

## 31d00    <u>Ambulance services.</u>

**(a)**    Numerous hours worked questions may arise with respect to employees engaged in ambulance services.  The most common are as follows:

(1)    *Less than 24 hours duty*

CHAPTER 31 TABLE OF CONTENTS

Ambulance employees who are required to be on duty at their employer's place of business for periods of less than 24 hours are working even though they are permitted to sleep or engage in other personal activities when not busy.  *See* 29 CFR 785.21. However, the usual rules with respect to meal periods would apply when they are relieved of all duties for the purpose of eating meals.

(2)     *Duty of 24 hours or more*

*See* 29 CFR 785.22.  Some ambulance employees may be required by the employer to be on duty on his premises for 24 hours or more.  The parties may agree to exclude bona fide meal periods and a regularly scheduled sleeping period of not more than 8 hours, provided the employer furnishes adequate sleeping facilities and the employee can *usually* enjoy uninterrupted sleep during the period.  If the sleeping period is *more* than 8 hours, *only* 8 hours may be excluded from hours worked.  Any interruption of the sleeping period to respond to calls must be counted as hours worked.  If the period is interrupted to such an extent that the employee cannot get a *reasonable* "night's sleep," the entire sleeping period must be counted as hours worked.  For enforcement purposes, the night's sleep will be considered *reasonable* if the employee can get *at least* 5 hours sleep during the period.  Thus, where these tests are met, the *actual* sleeping time (*i.e.*, not less than 5 hours and not more than 8 hours) may be excluded from hours worked.  Off-duty periods during which the employee has complete freedom from duties and may leave the premises for his or her own purposes may also be excluded.

(3)     *Employees who reside on the employer's premises permanently or for extended periods of time*

Some ambulance service employees reside on their employer's premises.  In such cases, the employee is not working all the time he is on the premises.  In determining hours worked, bona fide off-duty time need not be counted and any reasonable agreement of the parties which takes into consideration all the pertinent facts will be accepted.  *See* 29 CFR 785.23.  In the absence of an agreement, the WHI should make a reasonable determination giving recognition to the facts in the particular case which indicate the amount of time that the employee does have to eat, sleep, and devote to his own pursuits.

(4)     *On-call time*

Except where the employee is on duty 24 hours or more or resides on the premises, time spent by an employee in an on-call status at his or her employer's establishment is hours worked.  On the other hand, where an employee is not required to remain on his or her employer's premises but is free to engage in his or her own pursuits and merely required to leave word where he or she may be reached, the time so spent is not considered to be hours worked.  *See* 29 CFR 785.17.  If the employee does in fact go out on a call, the time actually spent in making the call including travel time is hours worked.  Also, there may be situations when calls are so frequent or the on-call conditions so restrictive that the employee is not really free to use the intervening periods for his or her own benefit.  In such cases he or she may be considered as engaged to wait rather than waiting to be engaged and the waiting time would also be counted as hours worked.

**CHAPTER 31 TABLE OF CONTENTS**

(5)    *Employee who takes ambulance to his home*

In the ordinary case where an employer permits an employee to drive an ambulance to and from his home for the employee's own convenience, the time so spent in driving is not hours worked (*see* FOH 31c01). If the employee is required to take the ambulance home in order to be able to respond to calls immediately, all the time spent in driving would be hours worked. The time the ambulance remains parked idly outside the employee's residence, and the employee is free to engage in his own pursuits subject only to the understanding that he or she leave word at his or her home or with company officials where he or she may be reached, would not be regarded as hours worked under the FLSA. The waiting time would be counted as hours worked only in situations of the type referred to in the last two sentences of paragraph FOH 31d00(a)(4). If the ambulance is parked at the employee's home, the employee would be considered working from the time he or she sets out on a call until the time he or she returns to his or her home.

**31d01    Community residences for individuals with intellectual or developmental disabilities and others in need of custodial care.**

**(a)**    Employees of these group homes may have regularly scheduled off-duty periods during the day (for which they are not paid) which might ordinarily break a continuous tour of duty of 24 hours or more. Therefore, a question arises as to whether their sleep time can be deducted from working time.

**(b)**    **Full-time houseparents**

The facilities in question employ houseparents, as well as relief staff in many cases, to provide custodial care for individuals who reside at the facilities. The houseparents sleep overnight, sometimes as many as 5 or 6 days in a row, after which they get a day or 2 off. In addition, the houseparents may also have several hours off each afternoon, when they are free to do whatever they choose, including leaving the premises. They sleep in private quarters separate from the residents of the group home. Many of these houseparents maintain permanent residences elsewhere in the community, but others have as their only residence the facility for individuals with intellectual or developmental disabilities. Where such full-time house parents meet the standards set forth in FOH 31b20, they are considered to be residing on the premises in accordance with 29 CFR 785.23. Therefore, the sleeptime rules in 29 CFR 785.22 -.23 will be applied.

**(c)**    **Relief employees**

(1)    The relief staff may stay overnight at a facility for one or more nights a week. During a 24-hour period, these employees may also have regularly scheduled off-duty time during the day with complete freedom from all responsibilities. They, too, sleep in private quarters separate from the residents of the group home.

(2)    In situations where a community residence employs at least one employee who resides on the employer's premises "for extended periods of time" (*see* FOH 31b20 and 29 CFR 785.23), the employer and a relief employee who performs essentially the same duties as such full-time employee may enter into a reasonable agreement (*see* FOH 31b18(b)) to hours worked. Such an agreement, entered into in advance of the performance of any work, may provide that sleeping time of up to 8 hours can be

excluded from compensable hours of work, regardless of the length of the tour of duty involved.  Also, a mutually agreed-upon amount of off-duty time, during which the employee is completely free from all responsibilities, can be excluded from compensable hours of work.  Since the residents of such facilities are usually on the premises all day on weekends, the hours worked by weekend relief employees may be significantly longer than the hours worked by the employees who work weekdays. Agreements with weekend employees must reflect such differences.

**CHAPTER 31 TABLE OF CONTENTS**

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GONJA YAYLA, | : | |
| *Plaintiff*, | : | CIVIL ACTION NO. 5:20-CV-04395-EGS |
| | : | |
| v. | : | |
| | : | |
| VALLEY YOUTH HOUSE, | : | |
| t/a and/or d/b/a VALLEY YOUTH | : | |
| HOUSE COMMITTEE, INC., VALLEY | : | |
| YOUTH HOUSE ENDOWMENT | : | |
| FOUNDATION, and/or VALLEY | : | |
| YOUTH HOUSE, SPE, LLC[1] | : | |
| | : | |
| *Defendants*. | : | |

## FINAL SETTLEMENT APPROVAL ORDER

**AND NOW**, this _____, day of _____2022, upon consideration of the Parties'

Joint Motion and Incorporated Memorandum of Law for Approval of the Parties' FLSA Settlement

and all other submissions and proceedings in this matter, it is hereby **ORDERED** as follows:

**WHEREAS** Gonja Yayla ("Plaintiff") brought claims against Valley Youth House

("Defendant") for alleged violations of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201,

*et seq.* ("FLSA") and the Pennsylvania Minimum Wage Act of 1968, 43 P.S. §§ 333.101 *et seq.*

("PMWA");

**WHEREAS** the Parties have considered and evaluated their respective positions in light

of relevant statutes and case law and, after extensive confirmatory discovery into the scope and

nature of the claims presented, participated in extensive, arm's-length settlement negotiations

overseen by an experienced wage and hour mediator;

---

[1] Valley Youth House Committee and Valley Youth House SPE, LLC are incorrectly identified as "Valley Youth House Committee, Inc." and "Valley Youth House, SPE, LLC" in the caption. These two entities did not employ Yayla or any other potential class member. The entities have no assets and are improper parties to this case.

**WHEREAS** the Parties' efforts have resulted in a proposed resolution commemorated in their Settlement Agreement and Release ("Settlement Agreement");

**WHEREAS** Defendant, in exchange for the mutual promises, releases, and consideration described in the Settlement Agreement, has agreed to make a maximum settlement payment of $85,000.00 to Plaintiff and Plaintiff's counsel as outlined in the Settlement Agreement;

**WHEREAS** the Court has carefully reviewed and considered the terms of the Settlement Agreement and the Parties' Joint Motion and Incorporated Memorandum of Law for Approval of the Parties' FLSA Settlement and all other submissions and proceedings in this matter;

**IT IS HEREBY ORDERED THAT:**

1.      The proposed settlement is entitled to a presumption of fairness because: 1) the settlement negotiations occurred at arm's length with the assistance of an experienced wage and hour mediator; 2) there was sufficient discovery; 3) the proponents of the settlement are experienced in similar litigation; and 4) Plaintiff has not objected to any substantive term of the proposed settlement;

2.      This Court hereby **APPROVES** the Parties' Settlement Agreement, because they have sufficiently demonstrated that the complexity, expense and likely duration of the  litigation; the reaction of Plaintiff to the settlement; the stage of the proceedings and the amount of discovery completed; the risks of proving liability; the risks of proving damages; the risks of maintaining the collective action through the trial; the ability of the defendant to withstand a greater judgment; the range of reasonableness of the settlement in light of the best possible recovery and all the attendant risks of litigation suggest that the proposed settlement is fair, reasonable and adequate and resolves a *bona fide* dispute between the Parties;

3.     This Court hereby **APPROVES** the proposed $85,000.00 settlement amount provided in the Settlement Agreement, including $33,465.00 to pay damages and lost wages, including liquidated damages, claimed by Plaintiff, as fair, reasonable and adequate because this amount represents more than the maximum damages claimed on behalf of Plaintiff in a "best-case" scenario in light of the substantial risks of continued litigation;

4.     This Court hereby **APPROVES** the proposed $30,600.00 attorneys' fee payment and $20,935.00 in costs of litigation as fair, reasonable and adequate based on this Court's consideration of each of the relevant factors, including the quality of the result reached, the absence of any objections from Plaintiff, the skill and efficiency of Plaintiff's counsel, the complexity and duration of this litigation, the risk of non-payment Plaintiff's counsel assumed and the amount of time Plaintiff's counsel devoted to the case;

5.     This Court hereby **GRANTS** the Parties' Joint Motion and Incorporated Memorandum of Law for Approval of the Parties' FLSA Settlement and directs the Clerk to mark this matter **DISMISSED WITH PREJUDICE**; and

6.     Without affecting the finality of this Order, this Court will retain jurisdiction to enforce the terms of this Settlement Agreement and preside over any issues flowing from distribution of the settlement proceeds.

**BY THE COURT:**

_____

**Hon. Edward G. Smith**